Woods v. Curry.

No. 22,949.

## C. E. WOODS and J. E. GEORGE, *Appellees*, v. L. S. CURRY, *Appellant*.

### SYLLABUS BY THE COURT.

USURY—*Promissory Note—Usurious Consideration—Note Noncollectible.*
Plaintiffs sued on a promissory note for $5,000. Defendant answered
that the note was without considerat'on and was given for usury ex-
acted in a loan of $25,000, evidenced by a note for that sum bearing
ten per cent interest, and that the principal and interest had been
fully paid. On the trial plaintiffs admitted that the note was a re-
newal of a $3,500 note taken in connection with and as part of the
$25,000 loan transaction and that the amount of the note was in-
creased to $5,000 to cover $1,500 commission for making the $25,000
loan. *Held,* plaintiffs' admission that the note in suit was given in re-
newal of the one taken in connection with and as part of the original
loan transaction prevents a recovery because that transaction was
evidenced by a note already loaded with all the law permitted it to
carry, and any other note given with and as part of the same trans-
action was necessarily usurious.

Appeal from Seward district court; CHARLES E. VANCE,
judge. Opinion filed November 12, 1921. Reversed.

*R. L. Holmes, C. G. Yankey, W. E. Holmes, D. W. Eaton,*
all of Wichita, and *G. W. Sawyer,* of Liberal, for the appellant.

*V. H. Grinstead,* and *M. F. Cosgrove,* both of Liberal, for the
appellees.

The opinion of the court was delivered by

PORTER, J.: The action was on a promissory note for $5,000.
The defense was that the note was given for usury in connec-
tion with a loan. The plaintiffs prevailed and the defendant
appeals.

Plaintiffs are officers of the First National Bank of Liberal,
C. E. Woods being cashier. On September 17, 1913, Woods and
George made a loan to L. S. Curry of $25,000 and took his note
for that amount due in sixty days and payable to their order,
with interest at the rate of ten per cent per annum. The note
was secured by deeds to real estate which Curry executed and
delivered to the payees under a written agreement. Curry's
account with the bank was credited with the face of the note

less the interest. There was an agreement between the parties that Curry was to pay George and Woods a bonus of $500 for making the loan. The bonus had not been paid when the note fell due. Curry wanted the note renewed and after several weeks of parleying, an agreement for an extension was made and a new note was executed for $25,000 payable to the plaintiffs which Curry has since paid with the full ten per cent interest. During the negotiations for the extension of the loan, the parties agreed that Curry should pay a bonus for the extension, and also pay the $500 bonus on the original loan.

One of the questions in the case is, What was the amount of the second bonus agreed upon? Curry's positive testimony is that he agreed to pay $3,000 in addition to the $500 he owed as a bonus. Woods testified that the amount agreed to be paid was $1,000, but his testimony in respect to this is, to say the least, equivocal. On the other hand, Curry offered in corroboration of his statement a written instrument executed in duplicate and signed by him during the negotiations for the renewal of the $25,000 note. The fact that this agreement was written and tendered to Woods and George for them to sign is admitted by Woods, who was the only witness for plaintiffs. The instrument reads as follows:

"Liberal, Ks., 11-20-13.

"It is hereby mutually agreed by & between L. S. Curry, J. E. George & C. E. Woods that a certain contract by & between the above named parties dated Sept. 17-1913 shall be extended for 90 days, said Curry hereby agreeing to pay 10% int. on the $25000.00 & a bonus of $3000.00 for said extension and $500.00 bonus which is due on the original contract.

"Witness our hand the day and year first above written.

"L. S. CURRY."

Curry testified:

"Mr. George said he would like to have something to show for the agreement to pay the bonuses. Would like to have a note or contract or something, so I wrote out a couple of contracts. . . . I wrote up these papers and after I had written one, Mr. George read it while I was writing the other. Mr. Woods came in and picked it up and read it. Mr. George had picked up a pen and was about ready to sign it but Mr. Woods came back and beckoned him and when he came back he did not sign it. . . . I wrote these papers on letter heads in the bank and kept them both."

Woods testified that Curry was in the bank, and—

"We told Mr. Curry that if we could get the money we would but we

would want something to secure the loan some place else because we were borrowing the money and we did borrow it.

"Q. And then what did Mr. Curry say about that, about getting the money for him?    A. He wanted to fix it up.

. . . . . . . . . . . . . . .

"I can't say just when it was fixed up. He was in there and wrote out a piece of paper, something he would do, and showed it to us, and I told him we would rather have the money at that time, didn't want to sign anything. We wanted to know whether we could get the money or not before we signed anything. That was in November. He wanted us to sign these papers, but we declined to do it. Mr. George had to have money for some cattle."

This occurred on November 20. Eighteen days afterwards when plaintiffs had succeeded in arranging to borrow from another bank the money Mr. George required in the purchase of cattle, they were ready to agree to extend Curry's loan and on that date, December 8, they took Curry's note for $3,500, and later the $25,000 note was renewed. Curry claims this $3,500 note was given for no other consideration except in payment of the bonuses. Woods testified repeatedly that the note sued on for $5,000 is a renewal of the $3,500 note, and that both were given in connection with the loan transaction. He offered no suggestion of any reason why Curry would make an offer in writing to pay plaintiffs $3,500 in bonuses if the agreement was to pay but $1,500. The only reason he gives for their refusal to sign the contract which Curry tendered them on November 20 was that they were not yet ready to agree to an extension until they could arrange to obtain money elsewhere for Mr. George to buy cattle.

When the renewal of the $25,000 note matured, Curry had moved away from Liberal. At that time the bank also held a note against him which was past due. Curry was in Cowley county and Woods went there to see him and threatened foreclosure unless the three notes, including the $3,500 note were renewed. Curry told him that just as soon as he could he would go to Liberal, and on October 21 he drove there, arriving after banking hours. He saw Woods at the bank and gave another renewal note for the $25,000 loan, renewed the note held by the bank, and also renewed the $3,500 note, although it was not due for fifteen or twenty days. He testified that the notes were in the vault at the time, and that he was not sure whether the one he signed in renewal of the $3,500 note was

filled out or not. He introduced in evidence the canceled notes which Woods mailed to him a few days afterwards. Woods testified that the $3,500 note was filled out when it was signed. In explanation of how it came to be increased $1,500 he said that it included the $500 and $1,000 bonuses. He was asked to explain why he made Curry take up the note and put it in the $5,000 one fifteen days before it was due. His answer was:

"Well, sir; if he was out here and the note is about due—few days before it was due, and this other twenty-five thousand dollars; I wanted them fixed up and I had it all fixed at once I guess.

"Q. Mr. Woods, he fixed up the twenty-five thousand dollar note on the same day? A. Yes, sir.

"Q. Why did you ask him to take up the thirty-five hundred dollar note fifteen days before it was due. A. Probably fixed them both up while he was here."

Again, on cross-examination, he testified:

"Q. That five hundred dollars that he agreed to give in the first place, and this one thousand dollars, does it go to make up part of the five thousand dollar note? A. Yes, sir.

.     .     .     .     .     .     .     .     .     .     .     .     .

"Q. Then the note of thirty-five hundred dollars to C. E. Woods and J. E. George, December 8, 1913, what was that for? A. In connection with this other deal.

"Q. With the twenty-five thousand dollar deal? A. Yes, sir.

.     .     .     .     .     .     .     .     .     .     .     .     .

"Q. That matter ran along until December 8, 1913, when Mr. Curry gave a note for thirty-five hundred dollars? What is that for? A. I can't say.

.     .     .     .     .     .     .     .     .     :     .     .     .

"Q. I am asking you whether you know that that thirty-five hundred dollar note don't include the five hundred which Mr. Curry agreed to pay you as bonus for securing the original loan in September, and three thousand dollars which he agreed to pay you as a bonus for getting it in November? A. I could not say.

.     .     .     .     .     .     .     .     .     .     .     .     .

"Q. I believe you stated the five hundred dollars he agreed to pay you in September was in the thirty-five hundred dollar note. A. I do not know.

.     .     .     .     .     .     .     .     .     .     .     .     .

"Q. The five hundred might be in there [in the thirty-five hundred dollar note]? A. It might.

.     .     .     .     .     .     .     .     .     .     .     .     .

"Q. Didn't you tell me the reason this thirty-five hundred grew to

Woods v. Curry.

be five thousand is that it might include fifteen hundred for bonus? A. Yes, sir."

He testified that when Curry first came in to see about extending the note they did not care to extend it, but the matter was permitted to run along until December 8 when Curry gave the note for $3,500. He was asked what that was for.

"A. I can't say.

"Q. Did you ever, Mr. Woods, yourself and Mr. George, ever loan Mr. Curry any other money except the twenty-five thousand dollars? A. I think we paid a draft. . . . I think I advanced the draft drawn up in Nebraska.

"Q. When? A. I can't say.

"Q. What was it for? A. I don't remember.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. How do you know if you can't tell the date or amount paid? A. I know I must have.

"Q. You know you must have in order to account for the balance of the thirty-five hundred dollars note? A. Yes, sir; that is it exactly.

"Q. Just had to be? A. Yes, sir."

Later on in his testimony he was confronted with a canceled note given by Curry to the bank, attached to which was a memorandum in Woods' handwriting showing the items which went to make up that note, and he admitted that an item of $2,500 was for the Nebraska draft.

In *Marshall v. Beeler*, 104 Kan. 32, 178 Pac. 245, the action was for the recovery of usurious interest. The original loan was for $97,500. When it matured the borrower was obliged to agree to pay a bonus of $2,500 for an extension, and a new note was taken for $100,000 which included the bonus. The provisions of the statute were construed in that case and it was held that while the bonus undoubtedly fell within the definition of an involuntary payment—until it was actually paid—Marshall could not recover because he had paid the full face of the note including the bonus without any compulsion, and therefore could not maintain the action. It was held that in any action brought by the creditor to recover the excess, the statute gave the borrower a perfect defense.

In the present case the situation of the parties differs in no respect because of the fact that different instruments were taken representing the usury instead of including it in the original note. Sometimes the usurious portion is included in the original note; but often it is represented by a separate

instrument which the courts treat as part of the same transaction. There are many illustrations in the old books disclosing the use .of all· manner of devices and subterfuges by money lenders to escape the ·penalties imposed by law upon the taking of usury. In an old case, decided at *nisi prius,* in the court at Westminster in the time of George III, (1810), it was' shown that the plaintiff, who brought suit upon a bill of exchange, refused to discount the bill except upon the following conditions: "that the defendant should take a banker's cheque for 250*l.* a promissory note at 2 months for 286*l.* 12*s.* and a landscape in imitation of *Pouffin* to be valued at 150*l.* The defendant agreed, and the bill was discounted accordingly." At the trial defendant "offered to prove that the plaintiff had himself purchased the picture for 32*l.* and that this was its full value." Lord Ellenborough expressed the opinion that the burden was on the plaintiff to prove that the picture was worth the price which the defendant was required to pay.

"Garrow for the plaintiff said he was not prepared with evidence of the value of the picture; but contended that if the defendant was to make this an usurious transaction, the *onus* was thrown upon him of proving that a grossly extravagant and colourable price had been set upon the article—as had been done with respect to the ostrich feathers, which were proved to be sold and repurchased by the same money-lender several times in the same day."

"Lord Ellenborough—Where a party is compelled to take goods in discounting a bill of exchange, I think a presumption arises that the transaction is usurious. To rebut this presumption, evidence should be given of the value of the goods by the person who sues on the bill. In the present case I must require such evidence to be adduced: and I wish it may be understood that in similar cases, this is the rule by which I shall be governed for the future. When a man goes to get a bill discounted, his object is to procure cash, not to encumber himself with goods. Therefore, if goods are forced upon him, I must have proof that they were estimated at a sum for which he could render them available upon a resale, not at what might possibly be a fair price to charge to a purchaser who stood in need of them. Can you show that the defendant could have sold your imitation of Pouffin for 150*l.*?"

"Garrow [for the plaintiff] allowed that though the rule just laid down .by the Chief Justice might bear hard against his client in this particular instance, its general operation would be most salutary."

"Plaintiff nonsuited." (*Davis v. Hardacre,* 2 Campb. 375, 376.)

The trial court allowed Curry credit for $1,000 illegal consideration and gave judgment against him for $6,297.76. Presumably this was upon the admission of the plaintiffs that

$1,000 of the bonus was for procuring the extension, and also upon the theory that the first $500 bonus was not usurious because it constituted a commission for procuring the loan from George. But all the notes were payable to Woods and George, and drew the full ten per cent interest. It is a common thing for usurers to attempt to avoid the statute by calling any excess of the legal rate a commission or bonus, but if it be exacted from the borrower as a condition to the loan, the latter is tainted with usury no matter what the transaction is called. (39 Cyc. 971.) As a matter of common knowledge, it is true that lenders are frequently compelled to borrow part or all of the sums they loan. It is clear that the bonus of $500 and the one of $1,000 were both usurious.

In the face of plaintiffs' admissions it was manifest error for the court to allow a credit upon the instrument of but $1,000. In any view of the testimony defendant was entitled to a credit of $1,500. He makes the contention that he was entitled to a further credit of $1,500 as the statutory penalty. (*Marshall v. Beeler,* supra.) For reasons, now to be stated, we think the question of allowance of penalties need not be considered because of another proposition, which we think is decisive of the whole controversy.

Of course this court will not attempt to weigh conflicting testimony. It is not necessary to do that, however, to determine the right of the matter and direct the proper judgment. While not permitted to pass upon the weight of the testimony, we are not required to stultify ourselves by ignoring undisputed facts. The note fell due in the spring of 1914. So far as the evidence discloses, no effort was made to enforce collection until this suit was brought in March, 1918. The answer pleaded that the note was given without consideration and for usury. Woods admitted that he expected when he came to testify to be called upon to say what items of indebtedness went into the note in controversy. He was an experienced bank cashier and had charge of all the transactions involved in the giving of the various notes, but he was unable or unwilling to say what constituted the consideration for the note sued upon, although conceding that at least $1,500 of the consideration was represented by usurious bonuses. In his cross-examination he testified:

"Q. Mr. Curry did agree to give you one thousand dollars if you would get that money? A. Yes, sir.

"Q. Did he ever agree to give you three thousand dollars? A. I don't think so, don't remember of it."

The position taken by the plaintiffs throughout the trial upon the main issue appears from his statements near the close of his examination:

"Q. There is a matter of five thousand dollars that Mr. Curry is claimed to owe to you and Mr. George, do you tell this court you have not got any record of any kind as to what items make up this amount? A. Nothing but the note.

"Q. Note don't show? A. Shows he owes me five thousand dollars.

"Q. Are you not in the habit of keeping a book as to what the note is for? A. No, sir.

"Q. How do you know if there was any . . . money that you advanced? A. I know there are or I would not have the note."

In other words, at the conclusion of the testimony plaintiffs were standing upon the presumption that a promissory note imports a valid consideration. Curry had testified positively that there was no consideration for the $3,500 note except illegal bonuses, and in corroboration had produced a writing which plaintiffs concede was prepared by him and tendered to them as a memorandum of the contract; and the only reason suggested by plaintiffs for their refusal to sign it is that they were not ready at that time to agree to the extension. The reasonable implication from Woods' testimony with respect to this matter is that the writing set forth the understanding of the parties at that time.

The whole case, however, turns upon conceded facts. The controlling fact is that both Woods and Curry testified that the $3,500 note and the one given in renewal of it, were taken in connection with the $25,000 transaction. Now when the original note given for that loan matured there was nothing due but the face of the note; the interest had been taken out in advance. The renewal of that loan bore the full ten per cent interest and both principal and interest have been paid. Any additional note given as part of the original transaction was necessarily usurious, for the reason that the transaction could not support a valid consideration for another note. That transaction was evidenced by a note already loaded with all the law permitted it to carry; and when Woods testified, as he did

Barrett v. Montgomery County.

several times, that the note upon which plaintiffs seek to recover judgment was taken in connection with and as part of the original loan transaction, he was out of court; his position was not unlike that of a man who goes out on the limb of a tree and saws it off.

The judgment will be reversed and the cause remanded with directions to render judgment in favor of defendant for costs.