## WIGGIN TERMINALS, Inc., v. UNITED STATES.

Circuit Court of Appeals, First Circuit. December 23, 1929.

No. 2363.

Melville Fuller Weston (of Powers & Hall), of Boston, Mass., for appellant.

J. Duke Smith, Sp. Asst. U. S. Atty., of Boston, Mass. (Frederick H. Tarr, U. S. Atty., of Boston, Mass., on the brief; C. M. Charest, Gen. Counsel, and Ottamar Hamele, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for appellee.

Before BINGHAM, ANDERSON, and WILSON, Circuit Judges.

WILSON, Circuit Judge. A petition by the Wiggin Terminal Company to recover taxes paid under protest on the ground of an overassessment. It involves the payment in 1918 by the petitioner, out of certain designated receipts, of the sum of $25,000, which it claims should be deducted as an interest charge, but which the government contends was a capital expense.

The government demurred to the appellant's petition as amended. Its demurrer was sustained, and judgment ordered for the government. Since the issues are raised by a demurrer, the facts as stated in the petition must be taken as true.

The following facts are set forth in the petition as modified by the amendments: Late in 1915, the petitioner, which was conducting a warehouse business in Charlestown in the commonwealth of Massachusetts, desiring to install a fumigating plant in its warehouse for the fumigation of imported cotton, applied to the banking houses of Estabrook & Co. and Parkinson & Burr, both located in Boston, and hereinafter referred to as bankers, for a loan of $50,000, which was the estimated cost of the fumigating plant.

The first proposition made by the bank-ers was that they would finance the proposition if the fumigating business were put into a separate corporation, and the bankers were given two-thirds of its capital stock and the petitioner one-third.

To this the petitioner replied that "it was not willing to have any outside ownership, and that it was interested only in securing a loan. The bankers replied that if that was so, their terms for a loan would be * * * six percent interest and $50,000 bonus."

Upon this oral agreement, which was accepted by the petitioner, and the further understanding that the formal details of the transaction whereby this result would be accomplished were to be formulated later, Estabrook & Co., acting for themselves and Parkinson & Burr, in December, 1915, entered into contracts for the construction of a fumigating plant in the warehouse of the petitioner according to plans and specifications already prepared by the petitioner's engineers.

The petition also sets forth that the installing of such a plant required extensive structural changes in the warehouse of the petitioner, including heavy reinforcing of flooring, a superstructure of steel 90 feet long, 30 feet wide, and 20 feet high, specially designed to carry a massive and intricate system of piping and machinery. All the machinery and equipment was secured to foundations built into a heavy enforced concrete floor, which floor and superstructure was supported by a series of beams and columns transmitting the weight to pile bents under the pier shed. It also included the installing of a sprinkler system for fire protection throughout the warehouse, and the construction of a driveway ramp to enable trucks and teams to drive into the fumigating plant and other units of the warehouse for loading and unloading merchandise.

The plant and structural changes to support it so became a part of the warehouse building that it could not be removed without great injury to the building, and such of the equipment as could be removed, when removed, would have little value.

The plans and specifications for the construction of the plant and the structural changes in the warehouse had already been prepared by the petitioner's engineers, and the contracts for construction were all executed and the work of construction done under their supervision. The bankers took no active part in supervising the work, and never inspected it while in progress.

The total cost of the plant, including the expense of restoring one unit which collapsed

after completion, was approximately $78,000, instead of $50,000. The additional cost was paid by the petitioner in the first instance, though it was eventually paid out of the earnings of the plant, the same as the advances made by the bankers. The increased expense outside of restoring the unit which failed was not for independent and separate additions thereto, but for construction work and equipment that entered into the fumigating plant as a unified whole.

The petition also alleges that, in pursuance of a plan duly formulated for carrying out the informal understanding between the parties and for assuring to the bankers the repayment of the sum advanced with interest at 6 per cent., and the additional bonus of $50,000, a Massachusetts corporation was organized, which received its charter in February, 1916, with an authorized capital stock of $50,000, divided into 500 shares of the par value of $100 each.

In further pursuance of the plan already formulated, the bankers entered into a written agreement with the new corporation on February 15, 1916, which was known as the Terminal Fumigating Company, and which will hereinafter be referred to as the fumigating company, whereby the bankers agreed to complete the plant to the extent called for by the existing contracts already entered into by them in pursuance of their oral understanding, and as the contract stipulated, "(You to pay us the cost thereof as hereinafter set forth) or advance you the funds for that purpose upon your three months notes," with the further stipulation that the obligations of the bankers were to end when the total sums spent or advanced by them totaled $50,000. It was also further stipulated that the fumigating company was to reimburse the bankers for all expenses incurred in connection with the construction of the fumigating plant, including any sums spent on other parts of the warehouse not connected with the fumigating plant, such as installing a sprinkler system, made necessary by the increased fire hazard due to the installing of the fumigating plant. The bankers also agreed to convey the plant when completed to the fumigating company at cost, and obtain a lease from the petitioner, running to the fumigating company, of so much of the warehouse as was necessary for the construction and operation of the new plant.

On its part, the fumigating company agreed to reimburse the bankers for the cost of the plant to the extent of $50,000, pay it $300 for obtaining the lease, and issue to it 497 shares of its capital stock.

On the same day the fumigating company, as appears by the certificate required to be filed with the secretary of state when stock is issued after organization of a corporation (sections 11, 14, c. 437, St. Mass. 1903), issued to the bankers 497 shares of its capital stock, the consideration for which the certificate states cannot be itemized, but vaguely speaks of liabilities assumed, the payment of $300 to the bankers by the corporation for a lease, and the transfer of a fumigating plant at cost. Attached to the certificate was the contract above described between the fumigating company and the bankers, evidently in explanation of the consideration for the issuing of the stock.

The bankers then having at least all the capital stock of the fumigating company but 3 shares, and having agreed to obtain a lease from the petitioner of the necessary space in its warehouse, transferred, as the amended petition shows, not a completed plant, but such interest as it might then have in the incompleted plant on February 15, 1916, which was represented by an expenditure to that date of approximately $17,000.

In furtherance also of the plan formed by them and the petitioner, the bankers, on February 16, 1916, each entered into separate contracts with the petitioner, in which the petitioner agreed to give a lease to the fumigating company in the form already prepared, and the bankers each agreed to acquire 250 shares of the par value of $25,000 of the capital stock of the fumigating company, and further agreed to transfer this stock, "free of charge," to the petitioner, whenever the fumigating company had paid all advances made by the bankers to it, and the bankers shall each have received as dividends upon the said stock sums aggregating $25,000 or the total amount of the advances by the bankers to the fumigating company.

The fumigating company paid out of its earnings in 1916 the total of the advances of $50,000 and interest, and $10,000 in dividends to Estabrook & Co., and in 1917 $15,000 or the remainder of the amount to be received by them under the oral agreement, whereupon they transferred to the petitioner the 250 shares of the capital stock of the fumigating company held by it in accordance with their agreement dated February 16, 1916.

Parkinson & Burr, however, waived their dividends on the stock held by them in 1916 and 1917, as it was expressly provided in their contract with the petitioner they might do, and directed that they be paid to the petitioner, as they were interested in the financial condition of the petitioner, having

896

sold its preferred stock to their customers and the public.

In April, 1918, however, Parkinson & Burr entered into a new agreement with the petitioner, canceling the agreement of February 16, 1916, and transferred the 250 shares of stock held by them to the petitioner, and accepted the petitioner's unsecured agreement to pay them out of dividends received on the 250 shares of stock, the $25,000 to which they were entitled, and which was paid in December of that year.

In making up its consolidated tax return for 1918, which included the operations of the fumigating company as one of its subsidiaries, the petitioner deducted the amount so paid as interest paid on the loan under the original agreement entered into in 1915, as it apparently had done with reference to the sums paid to Estabrook & Co. in 1916 and 1917. The government refused to allow the deduction in 1918, contending that the payment was of the nature of a capital expense, and also directed the payments made in 1916 and 1917 to be restored to invested capital.

On these facts the District Court sustained the government. We think there was error here.

That the original oral agreement was for the payment of 6 per cent. interest and a bonus of $50,000 for the loan, cannot be gainsaid. The District Court, however, in the opinion filed, holds that by the written contracts the parties entered into a new arrangement.

In a measure this is true, but the petition sets forth that the plan formulated was carrying out the informal understanding between the parties and to assure to the bankers the payment of its loan with 6 per cent. interest and the additional sum of $50,000; and that it was in pursuance of this plan that the new corporation was organized and the contracts entered into. At all events, the result agreed upon was accomplished under the plan as carried out.

The bankers have had their loan repaid with interest at 6 per cent.; they have each received their share of the bonus agreed upon; the petitioner has the fumigating plant erected in its warehouse, which it owns indirectly through stock ownership, and by liquidation of its subsidiary may at any time own in its own right.

It was held by the court below that the contracts below created a new relation and other than that of debtor and creditor, namely, that of vendor and vendee. There were created new relations, but there was still left

the relation of debtor and creditor, though between different parties. The subsidiary, with the consent of all parties, was substituted for the petitioner.

Under chapter 107, § 3, Gen. Laws Mass. 1921, the oral agreement to pay the bonus of $50,000 for the loan could not be enforced. Any plan entered into, therefore, would have in view, not only the security for the payment of the loan, but also for the payment of the bonus. The bankers may have been willing to rely on their building lien and the good faith of the petitioners until the plan agreed upon could be put in operation. When the new corporation was organized, however, the plan agreed upon evidently contemplated at least a formal transfer of the title to the plant to the fumigating company, a lease by the petitioner to the fumigating company of such part of its premises as was necessary for the construction and operation of the new plant, the assumption of the loan and payment of the bonus by the new corporation, the latter to be paid from dividends on its stock, and the issuing of all the capital stock to the bankers to hold as security for the obligations until paid, when the stock would then be transferred to the petitioner.

The substitution of the subsidiary for the petitioner as the obligor, and an agreement to pay the bonus out of dividends, did not change the character of the payment from interest to capital expense. Having been agreed upon as a sum to be paid for the loan in addition to the regular rate of interest, its nature was not changed to a capital charge by an arrangement to pay it out of dividends. Arthur R. Jones Syn. v. Commissioner (C. C. A.) 23 F.(2d) 833.

While the contract between the fumigating company under date of February 15, 1916, and the bankers in terms provided for the completion of the plant by the bankers under existing contracts and the transfer of a completed plant to the fumigating company, it is quite evident that it did not express the real understanding between the parties.

Not only do the contracts in every other instance, not only between the bankers and the fumigating company, but also between the bankers and the petitioner, refer to the payments by the bankers toward the construction of the plant as advances, but a single act conclusively shows, we think, that the whole transaction was regarded as a loan of $50,000. When the construction contracts were completed, the bankers had expended or incurred an expense of only $47,190.82. They then advanced in cash the balance of $2,809.18 to make up the full $50,000 loan,

and took the notes of the fumigating company for the cash payment, which, as the petition sets forth, had nothing whatever to do with any construction account, but was a cash advance or loan, pure and simple. And, further, as showing it was not the understanding of the parties that a completed plant was to be purchased of the bankers at cost, as soon as the fumigating company had obtained a lease of the premises, and the bankers had all the capital stock of the fumigating company on the very same day on which they agreed to convey to the fumigating company at cost a completed plant, namely, on February 15, 1916, they conveyed by bill of sale any title they might have in the incompleted plant on which they had then expended only approximately $17,000.

The acts of the parties at this time demonstrate beyond peradventure that the subsidiary was only brought into being to carry out the original agreement of a loan and a bonus, as alleged in the petition.

As a matter of law, the construction of the fumigating plant involved so many structural changes in the building of the petitioner and so much of the equipment appears from the petition to have been built into the structure as to become a part of the realty, that the title thereto undoubtedly passed to the petitioner as the work progressed; and it is doubtful whether any legal title thereto could have been retained by the bankers which it could convey to the fumigating company, even if there had been an express agreement to that effect, which there was not. 11 R. C. L. 1064, § 8; Collamore v. Gillis, 149 Mass. 578, 581, 22 N. E. 46, 5 L. R. A. 150, 14 Am. St. Rep. 460; Pierce v. George, 108 Mass. 78, 11 Am. Rep. 310; Landigan v. Mayer, 32 Or. 245, 51 P. 649, 67 Am. St. Rep. 521; Henke v. Dillon, 15 Or. 610, 17 P. 148; Ford v. Cobb, 20 N. Y. 344; De Bevoise v. Maple Ave. Cons. Co., 228 N. Y. 496, 127 N. E. 487; Porter v. Pittsburgh Bessemer Steel Co., 122 U. S. 267, 7 S. Ct. 1206, 30 L. Ed. 1210; Detroit Steel Co. v. Sistersville Brew. Co., 233 U. S. 712, 717, 34 S. Ct. 753, 58 L. Ed. 1166; In re Seward Dredging Co. (C. C. A.) 242 F. 225, 230.

As the court said in the last case cited:

"In every jurisdiction it is possible that the vendor by conditional sale or other legal device for retaining title until payment made may, even under an agreement per se entirely lawful, permit his chattels to become so thoroughly a part of real property that they can no longer be severed therefrom, wherefore in common parlance they 'become realty.' "

It is quite evident upon the record that the only title or right in the incompleted plant the bankers had to convey on February 15, 1916, was a lien under chapter 197, Rev. Laws Mass. 1902, or at most an equitable lien under its agreements with the petitioner and the fumigating company. It may well be under the circumstances as between the fumigating company and the petitioner, if the question had been raised, that the petitioner, with knowledge of all the facts, having stood by and seen the bill of sale of the plant given, and having itself given a lease of the premises, would be estopped to deny the title of the fumigating company to the plant, at least during the term of the lease.

If by the bill of sale from the bankers and by the lease, the title to the plant passed to the fumigating company, and there was a valid consideration for the issuing of the stock to the bankers, the only ground disclosed by the record for transferring the stock "free of charge" to the petitioner instead of back to the fumigating company, upon the payment of the cost of the plant by the fumigating company and the payment of the bonus out of dividends—unless, indeed, the purpose was to carry out the oral agreement—was the advances by the petitioner of the balance of the cost over that advanced by the bankers; but, according to the facts set forth in the petition, this was also repaid to the petitioner out of earnings of the new plant before the transaction involved in this case took place in 1918.

That the several transactions were each a part of the plan agreed upon whereby the original proposition of the bankers to make a loan upon the terms of 6 per cent. interest and a bonus of $50,000 was to be accomplished, and the bankers assured of their pay, is, we think, the only consistent theory upon which the acts of the parties can be satisfactorily accounted for. The entire proceedings as set forth in the amended petition are merely a transparent attempt by indirection to carry out the original proposition between the petitioner and the bankers for a loan at what appears to be an exorbitant charge as interest. Brown v. Follette, 155 Ind. 316, 58 N. E. 197; Woods v. Curry, 109 Kan. 677, 202 P. 86; Kommer v. Harrington, 83 Minn. 114, 85 N. W. 939; Hyland v. Phœnix Loan Ass'n, 118 Iowa, 401, 92 N. W. 63.

That the bankers had confidence that it would prove a successful venture is conclusively indicated by their first proposition to finance the construction of the plant, if it could be placed in a separate corporation, and they could have two-thirds of the stock.

Their confidence and judgment was justified when it paid from its earnings the entire cost of the plant and a bonus of $50,000 in three years, and presumably as a rental to the petitioner a sum also equal to its dividends, at least the petition sets forth that the lease provided for such a rental.

It would appear, therefore, that the contingency upon which the bankers would receive their bonus (i. e., from dividends) was merely negligible. The payment of interest in the form of dividends does not change its character when it is shown that the reason for its taking that form was to avoid a usurious contract, or for some reason personal to the parties concerned. Arthur R. Jones Syn. v. Commissioner, supra.

If it be shown that dividends paid are, according to the intent of the parties, in fact interest, and the stock on which the dividends are paid is merely held by the creditor as security, it makes no difference what the reason was for paying in that form. The courts look to the real character of the payment, and construe the statute liberally in favor of the taxpayer. Gould v. Gould, 245 U. S. 151, 38 S. Ct. 53, 62 L. Ed. 211. The question involved in the case at bar is not really one of exemption, but a construction of the statute as to what constitutes interest as distinguished from capital charges within its meaning. Within reasonable limits, premiums to obtain funds for construction purposes may be treated as a capital expenditure, and properly so, but a premium of 100 per cent. as a charge for obtaining funds for plant construction is so unreasonable on its face as to render it prohibitive to treat it as a proper capital charge. According to the facts set forth in the petition, the actual invested capital of the petitioner and its subsidiary could not have been increased by this addition to the plant more than $78,000; yet the government by its ruling has increased its capital account by at least $50,000 more.

If, as urged, it would be an unreasonable construction of the informal agreement that the bankers were thereby to receive 106 per cent. for the use of their money, it would be just as unreasonable to assume that they were to receive $50,000 for the services which they performed in the construction of the plant and obtaining the lease from the petitioner.

The contracts executed in February, 1916, between the bankers and the petitioner, obviously cannot be construed to be a purchase by the petitioner of the stock as a capital asset. Each contract expressly provided that, as soon as the fumigating company paid the amount of the advances and the bankers received an equal amount in dividends, or $50,000, the stock was to be transferred to the petitioner *"free of charge."* There is nothing here to lay the foundation for a purchase by the petitioner of the stock.

If this be so, neither did the agreement between Parkinson & Burr and the petitioner in 1918, by which the bankers released their claim on the stock as security and accepted the unsecured promise of the petitioner to pay their share of the bonus out of the dividends on the stock, change its character. It did not thereby become a capital expense. The value of the plant was not thereby increased, nor the interest of the petitioner in the stock. Since February 16, 1916, the petitioner had held the beneficial interest in the stock. By the transfer in 1918, Parkinson & Burr, for some reason not disclosed by the record, merely substituted for the legal title to the stock as their security for the payment of their share of the bonus, an equitable claim on the dividends paid thereon, until their claim of $25,000 was paid. The actual value of the petitioner's interest in the plant and stock therefore was unchanged.

Under the allegation in the petition as amended, therefore, both the loan and bonus must be treated as assumed by the subsidiary, the bonus to be paid from dividends on its stock; and, when the stock was transferred to the petitioner in 1918, the payment of the bonus still remained a charge on the dividends on the stock which the petitioner agreed to discharge. Precedents to sustain such construction are not wholly lacking. Arthur R. Jones Syn. v. Commissioner, supra; Concord El. Co. v. Commissioner, 7 B. T. A. 1027; In re General Film Corp. (C. C. A.) 274 F. 903.

The judgment of the District Court is vacated, and the case is remanded to that court, with direction to enter judgment for the petitioner for $18,274.32, with interest from the date of payment.

ANDERSON, Circuit Judge, concurs in the result.