## PENN YAN AGWAY COOPERATIVE, INC.

v.

## The UNITED STATES.

No. 56–66.

United States Court of Claims.

Nov. 14, 1969.

MacAsbill, Jr., Washington, D. C., attorney of record, for plaintiff.

Ira M. Langer and Joseph Kovner, Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for defendant; Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Roald A. Hogenson with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a) [since September 1, 1969, Rule 134(h)]. The commissioner has done so in an opinion and report filed on November 20, 1968. Defendant requested the court to adopt the commissioner's findings of fact with the exception of Finding 45 and excepted to his recommended conclusion of law. The case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, with slight additions, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff in the sum of $113 plus interest as provided by law.

Commissioner Hogenson's opinion, as modified by the additions of the court, is as follows:

Plaintiff seeks a ruling in this case that in the computation of its federal income tax liability for the taxable year ending June 30, 1959, it is entitled to

deduct, as interest under § 163 of the Internal Revenue Code of 1954, or as ordinary and necessary business expense under § 162, the amount by which its payment that year to the Springfield Bank for Cooperatives for 4.07 shares of class C stock of that bank exceeded the fair market value of such stock at that time. Plaintiff paid $100 per share, or $407. The fair market value was $6.90 per share, or $28.08. Thus, the claimed deduction amounts to $378.92. If plaintiff is entitled to the deduction, judgment should be entered for plaintiff in the sum of $113, plus interest as provided by law.

Defendant's position is that the purchase of the 4.07 shares of the class C stock was a capital investment in the Springfield Bank for Cooperatives under §§ 118 and 1221 of the Internal Revenue Code of 1954, that no disposition of such stock has been made by plaintiff, that a deductible expense or loss did not occur, and that plaintiff's petition should be dismissed.

For the reasons hereinafter stated, it is my opinion that plaintiff is entitled to recover.

Plaintiff, a New York corporation, is and was a farmers' purchasing cooperative. Just prior to the commencement of its 1959 fiscal year, plaintiff borrowed $75,000 from the Springfield Bank for Cooperatives, Springfield, Massachusetts. In accordance with the two loan agreements involved, plaintiff executed and delivered to the bank its two promissory notes, each for $37,500, and received from the bank $74,900 in cash and one share of the bank's class C stock of $100 par value. This one share (not part of the 4.07 shares upon which plaintiff's claim is based) was that required by statute, 12 U.S.C. § 1134d (a) (3), to qualify plaintiff cooperative to borrow from the bank. Obviously, plaintiff had not acquired any of such stock previously.

During its fiscal year 1959, plaintiff was required to purchase from the bank 4.07 additional shares of the bank's class C stock at the par value of $100 per share. This requirement was provided by the cited statute and the terms of the loan agreements, which stated that the borrowing cooperative had to purchase such stock in an amount equal to not less than 10 or more than 25 percent, as prescribed by the board of directors of the bank with the approval of the Farm Credit Administration, of the amount of interest payable by the borrower to the bank for each calendar quarter. For the period of time involved herein, the rate of purchase had been duly fixed at 15 percent. Accordingly, plaintiff during the pertinent fiscal year paid $407 to the bank (being 15 percent of its interest obligations on the pertinent loans during that time) and received 4.07 shares of the bank's class C stock at par value of $100 each.

The 4.07 shares of class C stock are and were carried on plaintiff's financial records in an asset account entitled "Investments—Bank for Cooperatives." In its annual reports to stockholders, the Springfield Bank has consistently described the purchases and ownership of class C stock by its borrowing cooperatives as investment capital.

The Springfield Bank for Cooperatives is one of 12 regional banks, which together with the Central Bank for Cooperatives, comprise a system of banks for cooperatives operated since 1933 under charters issued by the Farm Credit Administration pursuant to statutory authorization.

Prior to the organization of the Farm Credit Administration and the system of banks for cooperatives pursuant to the Farm Credit Act of 1933, 48 Stat. 257, farmers generally as well as farmers' cooperatives had encountered severe difficulties in securing adequate commercial credit at reasonable interest rates. Such problems had not been solved in the administration by the Federal Farm Loan Board of the Federal Farm Loan Act of 1916, 39 Stat. 360, enacted by Congress to provide loans by the Federal

land banks on farm mortgage security to farmers and farmers' cooperatives.

To improve and expand the sources of credit at reasonable rates to farmers, and to stimulate the growth and development of farmers' cooperatives, Congress enacted the Farm Credit Act of 1933, *supra*, pursuant to which, the system of banks for cooperatives was established as part of the overall structure of the Farm Credit Administration. This agency in considerably expanded form succeeded to the functions of the previous Federal Farm Loan Board.

The capital of the banks for cooperatives was derived from public funds appropriated by Congress, except that additional capital was supplied pursuant to a provision of the founding act that a borrowing cooperative had to purchase $100 of stock of the lending bank for each $2,000 borrowed. However, such stock was redeemable on demand at the option of the cooperative upon the payment of the outstanding loan.

Defendant's original capital investment, or stock subscription, in the banks for cooperatives as they were established under the Farm Credit Act of 1933, *supra*, amounted to $110,000,000, with $5,000,000 provided to each of the 12 regional banks, and $50,000,000 to the Central Bank for Cooperatives.

In time, the leaders of the system of banks for cooperatives evolved a plan of retirement of government-owned stock, utilizing the revolving fund method, commonly employed in supplying capital to farmers' cooperatives by its members. In the operation of a farmers' cooperative, usually the members contribute the initial capital, with further contributions being made by each member in succeeding years in proportion to his use of, or benefits received from, the cooperative, and with capital investment being periodically returned to members in order of its contribution.

After a number of years of consideration of such a plan, Congress enacted the Farm Credit Act of 1953, 67 Stat. 390, which established the Federal Farm Credit Board to (a) exercise general direction and supervision over the performance of the system of banks for cooperatives, and to (b) consider and make recommendations to Congress on the best means for eventually retiring the government capital from the Farm Credit system.

Pursuant to the recommendations of the Federal Farm Credit Board, Congress enacted the Farm Credit Act of 1955, 69 Stat. 655, effective January 1, 1956, which provided a comprehensive plan for retirement of government-owned capital from the banks for cooperatives, with the ultimate management, control, and ownership of each bank to become vested in its borrowing cooperatives. The act provided for three classes of stock, each having par value of $100 per share: Class A for government-owned capital; class B to be issued to private investors; and class C to be issued only to farmers' cooperatives borrowing from the particular bank.

Class A stock could be issued only to the Governor of the Farm Credit Administration on behalf of the United States. It was nonvoting and no dividends could be paid thereon. Each regional bank was required to retire each year an amount of class A stock at least equivalent to the amount of class C stock issued for that year, with some exceptions not of great moment in this case.

As provided by the act, class B stock could be issued at par to any person. It was nonvoting and could pay dividends of not to exceed 4 percent per annum of its par value. It could be called for retirement at par, in the order of its issuance, but only after the retirement of all class A stock.

As provided by the act, class C stock, except upon authorization of the board of directors of the issuing bank and approval of the Farm Credit Administration, could be issued or transferred only to farmers' cooperatives. It could be issued at no more than its $100 par value and could pay no dividends. Each

holder of class C stock was entitled to no more than one vote, regardless of the number of shares held.[1] Each borrower from a bank was required to own at the time the loan was made at least one share of class C stock, and was also required to invest quarterly in class C stock an amount equal to not less than 10 nor more than 25 percent, as prescribed by the board of directors of the bank with the approval of the Farm Credit Administration, of the amount of interest payable by it to the bank during the calendar quarter. In the discretion of the board of directors of the bank, class C stock could be retired at par, in the order of its issuance. But class C stock issued for any fiscal year could be retired only after all class A stock had been retired, and all class B stock issued during or prior to that fiscal year had been called for retirement. Each regional bank had a first lien on class C stock as collateral for the owner's indebtedness to the bank, and could retire the class C stock of a defaulting borrower, at par, in total or partial liquidation of such indebtedness.

The overall purpose of the act was to accomplish retirement of all class A and B stock, after which the oldest class C stock (in order of its issuance) would be retired, as new class C stock was issued to borrowing cooperatives. Thus, complete ownership of the banks for cooperatives would become vested in the borrowing cooperatives, and a revolving fund method of capitalization would be fully established. 2 U.S.C.Cong. & Admin.News, p. 2957, 84th Cong., 1st Sess., 1955.

Congress intended that the class C stock would be the voting, common stock of each bank, 2 U.S.C.Cong. & Admin. News, supra, at pp. 2955–2956, and provided in the act that any holder of such stock shall not be entitled to vote, if it has not been a borrower from the bank within the period of two years next preceding a date, fixed by the Farm Credit Administration, prior to the commencement of voting. Since the class A and class B stockholders have no voting rights, the class C stockholders are the only ones with power to elect members to the board of directors of the bank. Prior to 1964, the holders of class C stock of each bank could elect only one of its seven directors, and since 1964, they have elected two of the seven. The other five directors are elected by the local district Production Credit Associations (two members), and the local district Federal Land Bank Associations (two members), with the seventh being appointed by the Governor of the Farm Credit Administration.

The rate of interest charged to plaintiff by the Springfield Bank on the pertinent loan transactions (as stated in the loan documents) was 4.75 percent per annum. This was exclusive of the 15 percent assessment on payable interest for purchase of class C stock. Such assessment could be considered in whole or in part as additional interest by way of a surcharge on the basic interest rate, or as an ordinary and necessary business expense, or as a measurement of the statutory obligation of a borrowing cooperative to invest capital in the lending bank for cooperatives.

The 15 percent surcharge on interest, if the stock purchase assessment be considered that, would increase the basic interest rate of 4.75 percent by 0.7125 to 5.4625 percent per annum. Since plaintiff concedes that 6.9 percent of the cost of each of the pertinent shares of stock (the $6.90 market value of each share paid for at $100 par value) was not deductible interest or expense, the surcharge on interest (under plaintiff's

---

1. The principle of one vote per shareholder, regardless of the number of shares held, is characteristic of farmers' cooperative organizations, in conformity with the Capper-Volstead Cooperative Marketing Associations Act, 42 Stat. 388, which exempted farmers and their cooperative marketing associations from prosecution for acting in restraint of trade, provided *inter alia* that no member of such a cooperative be allowed more than one vote, regardless of the amount of stock held by him.

theory) would be 93.1 percent of the 15 percent assessment, thus increasing the basic interest rate of 4.75 by 0.6633 to 5.4133 percent per annum.

Since their organization in 1933, the banks for cooperatives have consistently provided lower rates of interest to farmers' cooperatives than could have been obtained on similar loans at commercial banks. For the year 1960 (there being no specific evidence in the record for 1959), the comparative annual interest charges on loans to farm customers were respectively on mortgage and production loans: 4.75 and 5.75 percent by banks for cooperatives, and 6 and 6.9 percent by commercial banks.

It is obvious that even with the addition of the above-described 15 percent surcharge on the basic interest rate of 4.75 percent, plaintiff obtained a lesser rate of interest from the Springfield Bank than it could have obtained from a commercial bank, because plaintiff calculated the comparative cost of borrowing from the Springfield Bank visa-vis a commercial bank, and took into consideration that the requirement of purchasing class C stock (to the extent of 15 percent of interest payable on cooperative bank loans) was a loss of use of funds and that such expenditures were an added cost factor over and above the basic rate provided by the Springfield Bank. Furthermore, from the overall policy of the banks for cooperatives, guided by the Farm Credit Administration in expression of the will of Congress, it can be inferred that more favorable interest rates as compared to commercial credit rates have been and will continue to be provided by such banks to farmers' cooperatives, even adding the cost of the required purchase of class C stock on the theory that such cost is an increase of or a surcharge upon the basic interest rates provided by such banks. Plaintiff did not receive any special services other than the lending of money from the Springfield Bank.

As in the case of all the banks for cooperatives, the profits of the Springfield Bank, to the extent they exceeded certain amounts of reserves specified by statute, were required by law to be distributed to borrowers as patronage refunds, in the form of class C stock, not in proportion to the class C stock owned by each borrower, but in the proportion that the amount of interest on the loans of each borrower bore to the total interest earned by the bank on the loans of all borrowers during the fiscal year. This was in accordance with the cooperative principle that those who make use of the cooperative's facilities, and hence, bear the costs of operation, should be able to reduce their costs by receiving a portion of the cooperative's profits allocated on a patronage or use basis.

For its share of the distributed profits of the Springfield Bank for the fiscal year ending June 30, 1959, plaintiff received 9.76 shares of class C stock.

However, except for the right ultimately to receive their par value on redemption, the 4.07 shares of class C stock involved in plaintiff's claim did not entitle plaintiff to any benefit which plaintiff did not already enjoy by reason of having acquired in 1958 the single qualifying share required by law in order to permit it to borrow from the bank. The 4.07 shares gave plaintiff no additional voting rights, no additional right to share in the profits of the bank, and no additional benefits of any kind.

As of December 31, 1955, defendant had $6,600,000 invested in the Springfield Bank for Cooperatives, for which class A stock was issued. From January 1, 1956, the effective date of the act authorizing the three classes of stock, to June 30, 1959, defendant's holding of class A stock was reduced by $875,600 by redemption by the bank of class A stock in that amount. The retirement rate was about $245,000 per year during that period of time. As of June 30, 1959, there was no evidence of any trend toward a larger retirement rate.

As of June 30, 1958, the Springfield Bank had issued and outstanding about $7,800,000 par value of class A, B, and C

stock, all of which would have had to be retired before any of the class C stock issued in fiscal year 1959. Thus, plaintiff's 4.07 shares of class C stock acquired in that year would be reached for retirement in 30 to 31 years at the experienced retirement rate of $245,000 per year of the previously issued stock.

Plaintiff now owns and has continued to own the 4.07 shares of class C stock ever since acquired from the Springfield Bank in the taxable year involved. There have been no sales of class C stock other than issuance by a bank for cooperatives to a borrowing farmers' cooperative. As stated above, such stock could be issued or transferred only to a farmers' cooperative, except upon authorization of the bank's board of directors with approval of the Farm Credit Administration. There is no evidence that approval could be obtained of a sale to any investor other than a cooperative, and it is not shown that any cooperative would have been willing to buy plaintiff's 4.07 shares at any satisfactory price. Plaintiff reasonably believed that there was no market for such stock.

The fair market value of plaintiff's 4.07 shares of class C stock was established at $6.90 per share as of the time of its acquisition by plaintiff in 1959 by expert stock evaluation testimony adduced by plaintiff. Assuming correctly that no dividends could be paid on such stock, and that no sales had occurred, the experts concluded that the willing buyer would be an investor who would know that he would realize no return upon such stock except its $100 par value upon its retirement in 30 or 31 years, that such an investor, in accordance with historical experience in trading in common stocks, would expect a return (including dividends and appreciation in value) of 9 to 10 percent compounded annually on an investment in common stocks at that time, and that the sales price of $6.90 per share compounded annually at such a rate would amount to the $100 which would be returned to such investor in 30 to 31 years.

Defendant's basic position is that the legislative history and the statutory method of providing capital to the banks for cooperatives by use of the revolving fund principle demonstrate that plaintiff's purchase of the 4.07 shares of class C stock was intended by Congress, the bank, and plaintiff to be a capital investment, and that such stock is and was a capital asset acquired and held by plaintiff under § 1221 of the Internal Revenue Code of 1954.

Defendant ascribes a full value of $100 per share as of the time of plaintiff's acquisition of such stock on the illusory argument that such value is established by (1) the "extremely valuable intangible benefit" which all member cooperatives (including plaintiff among all others) received from the system of banks for cooperatives, i. e., the right to borrow large sums of money over long periods of time at low interest rates, as contrasted with rates available at commercial banks; (2) the alleged impossibility of assigning a "determinable market value" to such stock because of its special characteristics; and (3) the fairness for tax purposes of awaiting the realization of the $100 per share proceeds of redemption, since plaintiff's method of valuation was a "discounting of the redemption value" to $6.90 per share "based upon a speculation as to when it would be redeemed and a hypothetical discount factor derived from other unrelated investments."

But the cold fact remains that when plaintiff paid the $407 for the 4.07 shares, it received stock which was greatly less valuable from an economic and financial standpoint than the purchase price required by law and the terms of the loan agreements. The "intangible benefits" bestowed by Congress on farmers' cooperatives generally do not alter this fact. As reasonable management of the business would be expected to do, plaintiff considered the long delay in recovery of the purchase price of such no-dividend stock as a loss of use of funds in calculating the comparative loan

costs from the Springfield Bank vis-a-vis a commercial bank. The required purchase of such stock gave plaintiff no economic or financial benefit other than the circumstance that it could not have obtained the loan with its favorable interest rate without fulfillment of the statutory requirement. But in the extremely practical field of taxation, in which substance prevails over form, it cannot reasonably be concluded under the circumstances that Congress has granted favors to cooperatives in furtherance of agricultural policies and taken them away (on the theory of intangible benefits) in whole or in part in the field of raising of public revenues. It is obvious under the facts of this case that plaintiff did not consider, nor could it reasonably be held to have considered, that its required payment of $407 for such stock, was an investment, as no return on such purported investment could be realized, except repayment of the bare purchase price delayed for many years.

Of course, Congress considered the 15 percent surcharge on interest payable on loans as a means of providing capital to the banks for cooperatives, and the bank realistically and lawfully treated as capital, funds received in that manner. But from the standpoint of plaintiff-taxpayer, this was in reality an increase of the basic interest rate as an experienced cost of borrowing money from the bank, even described in the statute and in the loan agreements as a percentage of interest payable on the loans. Its expenditure of $407, at least in greater part, was in reality an item of cost of conducting its business, and in the absence of compelling law to the contrary, and to the extent that it was a reasonably ascertainable cost, should be offset against plaintiff's income in the taxable year involved, in accordance with the annual accounting principle of the federal income tax laws. This is true whether such ascertainable cost is deemed interest paid under § 163 or an ordinary and necessary business expense under § 162 of the Internal Revenue Code of 1954.

It is a well established rule of law, carefully analyzed and stated in Drybrough v. United States, 208 F.Supp. 279 (W.D. Ky. 1962), that the market value of common stock in a closely held corporation, there being no market sales of such stock, must be determined upon consideration of all relevant factors, such as earning capacity, anticipated profits, book value, and dividend yield. Obviously, the relevant factors concerning the value of plaintiff's 4.07 shares of class C stock are extremely limited. The only right they carry and have carried is long-delayed redemption at their bare purchase price. But the difficulties inherent in determining their fair market value should not be permitted to defeat a fair and just decision in this case, and consequently plaintiff's evaluation of its 4.07 shares is accepted as the most an investor (which apparently would have to be another farmers' cooperative) would pay, if such a purchaser could be found. Defendant did not offer any evidence to the effect that plaintiff's experts used a discount rate which was more than reasonable, and its expert testimony was that the pertinent stock had a value of $100 per share, unsupported unless defendant's theory of intangible benefits be sustained.

Of course, plaintiff had a right to participate in a division of the assets of the Springfield Bank in the event of its dissolution and liquidation prior to the redemption of plaintiff's stock. But such an event is and was extremely unlikely for various obvious reasons, including unlikely abandonment by Congress of firmly established agricultural policy and the fact that the Springfield Bank and the other banks for cooperatives were jointly and severally liable on $284,500,-000 of consolidated debentures issued by such banks. Furthermore, each of such banks has powerful safeguards against financial difficulty by delaying without cost (in the exercise of their statutory discretion) the redemption of class C stock, by increasing within the statutory limits the required purchase of new class

C stock up to 25 percent of interest payable on new loans, and by increasing the basic interest rate on new loans, in line with any increases in commercial credit rates, all without being required to distribute any dividends (other than class C stock) to its stockholders, and then only on a patronage or use basis.

Defendant stresses the fact that plaintiff has continued to own the 4.07 shares of stock ever since acquired from the bank, and argues that this fact distinguishes this case from various cases relied upon by plaintiff. Defendant's position is that even if it is decided that plaintiff acquired the stock when it had a value of $6.90 per share, at a price of $100 per share, such a bad bargain does not give rise to a deductible loss or business expense, but the tax consequences must await the disposition of such assets. Defendant relies upon Montana Power Co. v. United States, 159 F.Supp. 593, 595, 141 Ct.Cl. 620, 623–624, cert. denied, 358 U.S. 842, 79 S.Ct. 23, 3 L.Ed. 2d 76 (1958); Booth Newspapers, Inc. v. United States, 303 F.2d 916, 922, 157 Ct.Cl. 886, 896–897 (1962); Chase Candy Co. v. United States, 126 F.Supp. 521, 130 Ct.Cl. 102 (1954); Koppers Co., Inc. v. United States, 278 F.2d 946, 949, 150 Ct.Cl. 556, 560 (1960). But defendant's interpretation of such cases, whether such a holding be expressed or implied therein, cannot reasonably be applied under the facts of the instant case. In my opinion, it would be unfair and unjust to apply such a doctrine in the circumstances where disposition by plaintiff of the class C stock was a practical impossibility due to lack of a market, which resulted from the statutory restrictions placed upon such stock under the capitalization formula prescribed by law for the banks for cooperatives.

A bonus or premium paid by a taxpayer to induce a loan has been held to be deductible as interest within the meaning of the pertinent section of the federal income tax statutes. Wiggin Terminals, Inc. v. United States, 36 F.2d 893 (1st Cir. 1929) (Payment of $50,000 cash bonus); L–R Heat Treating Co., 28 T.C. 894 (1957) ($61,200 withheld from amounts paid to borrower as premiums for making loans); Court Holding Co. v. Commissioner, 2 T.C. 531, 536 (1943), rev'd on other grounds, 143 F.2d 823 (5th Cir. 1944), circuit court rev'd and tax court aff'd on the other grounds, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 567 (1945) (Payment of $350 cash bonus). In each of these cases, the borrower in effect parted with additional money, over and above the agreed interest rate, and for such additional payments, received nothing in return other than the use of the lender's money.

In *Wiggin, supra*, the payment of the bonus over and above the agreed interest rate was accomplished by the borrower issuing stock to the lender for a temporary period and paying dividends thereon equal to the bonus agreed upon, but the court held that it made no difference what the reason was for paying in that form, and ruled that the real character of the payment of the dividends was interest, according to the intent of the parties.

Universally accepted in cases involving the applicability of usury laws is the general principle, stated in Oil City Motor Co. v. C.I.T. Corp., 76 F.2d 589, 591, 104 A.L.R. 240 (10th Cir. 1935), and in Memorial Gardens of Wasatch, Inc. v. Everett Vinson & Associates, 264 F.2d 282, 285 (10th Cir. 1959), as follows:

* * * The familiar doctrine is invoked that if as a condition to the making of a loan at an apparently permissible rate of interest, the lender requires the borrower to sell property to him at less than its value or to purchase property from him at an excessive price, the difference represents interest and will be taken into account in determining whether the transaction is usurious. * * *

In the application of this rule, it would seem clear that if the lender required the borrower to purchase common stocks at a price greater than its mar-

ket value, as a part of the loan transaction, the excess of the price over the market value would be deemed interest in the case involving usury laws.

Plaintiff relies heavily upon Ancel Greene & Co., 38 T.C. 125 (1962), asserting that it is "square authority for the deduction claimed by plaintiff" herein, and also upon McMillan Mortgage Co., 36 T.C. 924 (1961).

In *Ancel Greene,* taxpayer was engaged in buying, selling, and servicing real estate mortgages, and sold mortgages to the Federal National Mortgage Association (FNMA), created by Congress and operating with government-owned capital, as a secondary market facility for home mortgages. By statute, 12 U.S.C. § 1718(a) and (b), FNMA was required to accumulate funds for its capital surplus account from private sources by requiring each mortgage seller to make payments of nonrefundable capital contributions, measured by a percentage of the unpaid principal amounts of mortgages purchased, and to issue its common stock for such contributions. In each of the mortgage sales agreements, reached in each of the three successive taxable years in suit, taxpayer subscribed to such stock, and agreed to have FNMA deduct from the sales price for the mortgages the purchase price of the stock, i. e., its par value of $100 per share. Such stock was actively traded, and during the taxable years in suit had a market value varying from $40.50 to $63 per share. In computing taxable income, taxpayer deducted as ordinary and necessary expense of doing business, the difference between the amount paid to FNMA for such stock and the market value thereof. Such deductions having been disallowed by the Internal Revenue Service, the issue as stated by the court was whether any portion of the purchase price of the stock, withheld by FNMA from the sales price of the mortgages, is *not includible*

or is *deductible* from taxpayer's income. Holding for taxpayer and against Internal Revenue that the sale of mortgages and the purchase of the FNMA stock constituted a single and inseparable transaction, the court concluded that the taxpayer was required to include in income, receipts from the mortgages sold to FNMA plus the fair market value of the FNMA stock. In effect, the court answered the issue as stated, by allowing as a deduction that which had been claimed in the taxpayer's returns, i. e., the difference between the amount paid to FNMA for such stock and its fair market value at the time. The court thus rejected the position of Internal Revenue that the pertinent stock was a capital asset with a cost basis of $100 per share, at least to the extent to which its cost exceeded its fair market value.

Contrary to any of the language used by the court, defendant construes the holding of the court in *Ancel Greene* to amount to the allowance of an ordinary loss on the sales of the mortgages.

The court further found in *Ancel Greene* that taxpayer held substantial portions of the stock for periods in excess of a year and a half and at the end of the last fiscal year in suit was still holding some stock which had been held by it for over 2½ years.[2] As in the instant case, taxpayer carried the pertinent stock in an investment account in its financial records. In the absence of any other evidence, the court assumed that taxpayer held such stock as an investment either for receipt of dividends payable thereon or in the hope that the market price would increase. On the second issue in the case, the court held that the shares of FNMA stock were capital assets when sold by taxpayer, ruling, however, that gain or loss upon such sales was to be computed by using as the basis for each share of stock sold, the fair market value of such share at the date of its issuance to taxpayer.

2. It is obvious that the tax court allowed deductions from income with respect to FNMA stock which the taxpayer purchased during but still held after the taxable years in suit, and thus impliedly held that the tax treatment accorded was not dependent upon a sale or exchange of such stock by the taxpayer.

Also in *Ancel Greene*, the tax court correctly commented that the facts with respect to acquisition of FNMA stock were identical except as to amounts and dates with those in *McMillan Co., supra*, but that the facts with respect to the carrying and holding of the stock differed in the two cases. In *McMillan Co.*, the FNMA stock was held by the taxpayer for relatively short periods of time, when a market existed for such stock, and with no intent to hold such stock as an investment.

In the instant case, the class C stock has been held by plaintiff for a substantial period of time, when no market existed, with no intent to hold such stock as an investment.

In *McMillan Co., supra*, the facts were identical with those in *Ancel Greene*, except that the taxpayer did not treat its FNMA stock holdings on its books and records as investments or capital assets, but rather as current assets, recording gain or loss on its sales of such stock as ordinary gain or loss. Furthermore, all shares of such stock were sold or otherwise disposed of within 6 months after their acquisition, with a large number within 60 days. Taxpayer in its contested tax returns treated its dispositions of the stock as ordinary gains or losses, with deficiencies assessed by the Internal Revenue Service on the theory that taxpayer's FNMA stock acquisitions were not purchases of inventory items but of capital assets; that the basis of such stock was its cost of $100 per share, irrespective of its fair market value; and that gain or loss upon subsequent disposition of such stock constituted a capital gain or loss, and not a deductible business expense. The court stated the issue to be whether such shares of stock were capital assets in the hands of the taxpayer, and sustained taxpayer's position that the FNMA stock in its hands

was within the first exclusion from the definition of a capital asset contained in § 1221 of the Internal Revenue Code of 1954, as follows:

> (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

The court reasoned that in the conduct of its business the taxpayer first resorted to the private investors' market, but when funds were not available there, turned to the secondary market (FNMA) provided by law for just such purpose, that the FNMA transactions were entered into in the ordinary course of taxpayer's business of marketing its mortgages, that as an integral and essential part of dealing with FNMA, it was required to take part of the proceeds of sale of mortgages to FNMA in FNMA stock at par value, and that it held such stock for sale in the conduct of its business, as shown by its prompt sales thereof, and also by the fact that it would have been unreasonable for taxpayer to have kept funds tied up in such stock when presumably it was the need for liquidity which compelled the sale to FNMA under less favorable terms than in the primary market. The court held that taxpayer's acquisition of such stock and its sale was a normal business activity incident to taxpayer's business, that such stock was not a capital asset, and that taxpayer's "expenditures (whether considered to be expenditures of cash or expenditures of part of the agreed price of mortgages) were necessary expenditures of the business and hence the amount was a deductible item." [3]  36 T.C. at 933.

---

3. In Section 8 of Public Law No. 86–779, 86th Cong., 2d Sess., September 14, 1960, 1960–2 Cum.Bull. 709, 713, Congress added § 162(d) to the Internal Revenue Code of 1954, effective for taxable years beginning after 1959, which specifically provides that whenever the amount of required capital contributions to FNMA exceeds the fair market value of the FNMA stock as of its issue date, the purchaser of such stock shall treat the excess as deductible ordinary and necessary expenses

**1382**

In M.F.A. Central Cooperative v. Bookwalter, 286 F.Supp. 956 (E.D.Mo.June 14, 1968), now on appeal to the Eighth Circuit Court of Appeals, the district court held that the class C stock, required to be purchased by taxpayer cooperative from the St. Louis Bank for Cooperatives in an amount equal to 15 percent of interest payable by such cooperative to the bank on its outstanding loans, did not have any fair market value at the time of its issue, that the purchase price paid for such stock was not interest, but that such price was deductible as ordinary and necessary business expense.

On the interest issue, the district court distinguished the above-cited *Wiggin Terminals, L–R Heat Treating*, and *Court Holding* cases on the grounds that in such cases, the debtor parted with additional money in the form of a bonus or premium and received nothing in return other than use of the lender's money, whereas in the case under consideration, *M.F.A. Central Cooperative* received class C stock for the additional money.

In support of its decision that the purchase price of such stock was an ordinary and necessary business expense, the district court analyzed the facts and circumstances involved, and concluded that the class C stock was of absolutely no use or benefit to the taxpayer, and that the only reason it was purchased was because taxpayer wanted to borrow money from the bank for cooperatives, and the agreement to purchase such stock was imposed as a condition of the loan.

While there is considerable merit in the district court's reliance on the theory of deductible expense, it is my opinion that the more logical basis for allowance of the claimed deduction in this case

under all of the facts and circumstances is that the purchase price of the class C stock (to the extent that such price exceeded the market value of such stock, as such value is conceded by plaintiff) was interest paid and deductible under § 163 of the Internal Revenue Code of 1954, particularly because the amount of such stock required to be purchased by law and by the loan agreements involved was measured by a percentage of the interest payable on plaintiff's outstanding loan obligations to the bank issuing the stock. It is held that plaintiff's claimed deduction is allowable as interest paid.[4]

---

paid or incurred during the taxable year in carrying on a trade or business. The Committee reports expressly stated that "Viewed from such a taxpayer's standpoint, the excess appears clearly to be expenditures which he must incur in order to sell the mortgage paper he holds." H.R.Rep.No.1662, 86th Cong.2d Sess. 3 (1960), 1960–2 C.B. 816, 818; S.Rep. No.1767, 86th Cong.2d Sess. 8 (1960),

1960–2 C.B. 829, 834. This legislative characterization precisely fits the situation in the instant case.

4. Mississippi Chemical Corp. v. United States, S.D.Miss. decided February 14, 1969, 69–1 U.S.T.C., par. 9266, now on appeal to the Court of Appeals for the Fifth Circuit, has recently held the same deduction allowable as interest.