# UNITED STATES *v.* MISSISSIPPI CHEMICAL CORP. ET AL.

No. 70–52.  Argued January 10, 1972—Decided March 6, 1972

MARSHALL, J., delivered the opinion of the Court, in which all Members joined except BLACKMUN, J., who took no part in the consideration or decision of the case.

*Matthew J. Zinn* argued the cause for the United States.  With him on the briefs were *Solicitor General Griswold, Assistant Attorney General Walters, Thomas L. Stapleton,* and *Leonard J. Henzke, Jr.*

*John C. Satterfield* argued the cause for respondents. With him on the brief was *J. Dudley Buford.*

*Mac Asbill, Jr., Harold S. Cook, D. Jeff Lance,* and *William W. Beckett* filed a brief for Agway, Inc., et al. as *amici curiae* urging affirmance.

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Mississippi Chemical Corp. and Coastal Chemical Corp. (hereinafter taxpayers) instituted this action for a tax refund in the United States District Court for the Southern District of Mississippi. Both taxpayers are "cooperative associations" within the meaning of § 15 of the Agricultural Marketing Act, 46 Stat. 18, as amended, 12 U. S. C. § 1141j, and thus qualify for membership in one of the 12 "Banks for Cooperatives" (hereinafter Bank(s)) established by the Farm Credit Act of 1933, 48 Stat. 257, as amended, 12 U. S. C. § 1134 *et seq.* Since their principal places of business are located in Mississippi, their regional Bank is the one located in New Orleans.

The Farm Credit Act of 1933 provides that members may borrow money from their Banks and, soon after securing membership in the New Orleans Bank, the taxpayers elected to borrow.[1] Thereafter, they were required by the Farm Credit Act of 1955, 69 Stat. 656, 12 U. S. C. § 1134d (a)(3), which partially amended the 1933 Act, to make quarterly purchases of $100 par value Class C stock of the Bank equal to not less than 10% nor more than 25% of the amount of the quarterly interest that they paid to the Bank on

---

[1] Mississippi Chemical Corp. acquired the share of stock qualifying it as a borrower in 1956; Coastal Chemical Corp. acquired its qualifying share in 1957.

their loans. During the period relevant to this lawsuit, the rate set by the Bank was 15%.[2]

On their tax returns for the years in question, the taxpayers claimed a $99 interest expense deduction for every $100 stock purchase required by the statute.[3] The Commissioner of Internal Revenue disallowed the deductions, the taxpayers paid the assessed deficiencies, and this action arose.

The United States has consistently contended that the stock that the taxpayers were required to purchase under the 1955 Act is a capital asset as defined by § 1221 of the Internal Revenue Code, 26 U. S. C. § 1221, and that its cost is nondeductible. See 26 U. S. C. § 263. The taxpayers have persistently urged that the money expended for this stock is part of "the amount [they] . . . contracted to pay for the use of borrowed money," *Old Colony R. Co.* v. *Commissioner,* 284 U. S. 552, 560 (1932), and is deductible as interest. 26 U. S. C. § 163 (a).

The District Court found for the taxpayers[4] and the United States Court of Appeals for the Fifth Circuit affirmed over the dissent of Judge Godbold. 431 F. 2d 1320 (1970). We granted certiorari on February 22, 1971, to review the decision of the Court of Appeals. 401 U. S. 908. We reverse for the reasons stated below.

[2] Mississippi Chemical Corp. challenges the Government's tax treatment of $55,113.19 spent from 1961 to 1963; Coastal Chemical Corp. challenges the treatment of $211,799.68 expended from 1958 to 1963.

[3] One dollar was treated as the cost of acquiring a capital asset.

[4] This decision is unreported but is found in App. 342–346. Other lower courts have split on the issue presented. Compare, *e. g.,* *M. F. A. Central Cooperative* v. *Bookwalter,* 427 F. 2d 1341 (CA8 1970), rev'g 286 F. Supp. 956 (ED Mo. 1968), pet. for cert. pending (No. 70–22), with *Penn Yan Agway Cooperative, Inc.* v. *United States,* 189 Ct. Cl. 434, 417 F. 2d 1372 (1969).

I

Early in this century, Congress recognized that farmers had a tremendous need for long-term capital at low interest rates. This led to the enactment of the Federal Farm Loan Act of 1916, 39 Stat. 360, as amended, 12 U. S. C. § 641 *et seq.* The immediate purpose of the bill was "to afford those who [were] engaged in farming or who desire[d] to engage in that occupation a vastly greater volume of land credit on more favorable terms and at materially lower and more nearly uniform interest rates than [were] present[ly] available." H. R. Rep. No. 630, 64th Cong., 1st Sess., 2. The long-range purpose was to stimulate and foster a cooperative spirit among farmers who, it was hoped, would work together to seek agricultural improvements which they would finance themselves. *Id.,* at 2–3; S. Rep. No. 144, 64th Cong., 1st Sess., 5.

The 1916 Act divided the United States into 12 regional districts under the general supervision of a Federal Farm Loan Board. Each district contained a federal land bank designed to loan money to farmers at low interest rates. Persons desiring to borrow were required to organize into groups of 10 or more which were called "national farm loan associations." Sec. 7, 39 Stat. 365.

In order to borrow from the district bank, an association had to establish that each of its members was an owner or a prospective owner of a farm, that the loan desired by each member was not less than $100 nor more than $10,000, and that the aggregate of the loans was not less than $20,000. Each association also had to subscribe for capital stock of the bank in the amount of 5% of the total loan sought by its members. The

association, in turn, was required to compel each of its members to purchase stock in the association equal to 5% of the amount of the loan sought by that member. Hence, there were two separate levels of cooperative association.[5]

The legislative history and the language of the Act itself indicate that Congress faced somewhat of a dilemma in structuring the land bank system. On the one hand, there was a strong congressional desire to stimulate a privately controlled, privately owned, and privately financed program based upon the cooperative efforts of dedicated farmers. This desire was effectuated in large measure in the stock-purchase requirements discussed above. On the other hand, Congress realized that without federal help, the existing plight of the farmers would probably render them unable to support the system themselves, and it would thus be doomed to failure:

> "The greatest difficulty in the establishment of a rural-credit system, based upon the cooperative principle, is met in connection with the inauguration of the system. Ample capital is absolutely necessary at the start and whatever sums the first borrowers might be able to contribute would in no wise suffice to get the system into successful operation. The system must be endowed, temporarily at least, with capital from sources other than the subscriptions to capital stock among the borrowers."
> H. R. Rep. No. 630, 64th Cong., 1st Sess., 9.

Accord, S. Rep. No. 144, 64th Cong., 1st Sess., 4.

---

[5] The statute also provided that "joint stock land banks" could be formed. These were corporations, composed of 10 or more persons, who desired to form banks to loan money to farmers without the aid of congressional financing. They were subject to the same restrictions and conditions imposed on the district land banks.

To resolve the dilemma, Congress provided for temporary public financing without charge to supplement the stock-purchase requirements of the statute. Congress also provided that each land bank must periodically increase its capital shares in order to achieve the goal of private ownership of the system, and to repay the temporary federal financing.

The land bank system remained virtually untouched [6] until the economic depression of the 1930's when Congress determined that more action was needed to aid farmers in establishing privately owned institutions designed to provide ready sources of long-term credit. The Farm Credit Act of 1933 was passed to supplement the 1916 legislation. It established, *inter alia,* regional Banks for Cooperatives in each of the 12 land bank districts and a Central Bank for Cooperatives in Washington, D. C. [7]

These Banks were authorized to make loans to "cooperative associations," defined as "association[s] in which farmers act together in processing, preparing for market, handling, and/or marketing the farm products of persons so engaged, and also . . . association[s] in which farmers act together in purchasing, testing, grading, processing, distributing, and/or furnishing farm supplies and/or farm business services." Agricultural Marketing Act § 15, 46 Stat. 18, as amended, 12 U. S. C. § 1141j.

The new Banks paralleled in many ways those already established under the 1916 legislation. The same re-

---

[6] While Congress did not disturb the land bank system, it added to it at various times. For example, Title II of the Agricultural Credits Act of 1923, 42 Stat. 1461, 12 U. S. C. § 1151 *et seq.* (1958 ed.), was designed to aid farmers in obtaining short-term credit.

[7] The Act also established a production credit system to improve short-term financing for farmers. That system has no bearing on this case.

gional districts were used, many of the same persons were eligible for loans from both institutions, and borrowers from both banks were required to be stockholders. The 1933 Act required cooperative associations to own, at the time a loan was made, an amount of stock in the Bank for Cooperatives equal in fair book value (not to exceed par value) to $100 per $2,000 of the amount of the loan, or 5%, the same amount of stock required of borrowers from land banks under the 1916 Act.

One notable difference between the 1916 and the 1933 Acts was that the latter did not regulate the membership of the cooperative association to any great degree. For example, members of cooperative associations did not have to own stock in the associations, only in the Banks; they did not have to borrow a minimum amount; and they did not have to be farm owners or prospective farm owners, but could be processors, handlers, testers, or marketers. This is in sharp contrast to the stringent requirements of the 1916 legislation. Another notable difference is that Congress invested substantially more money in the 1933 program ($110,000,000) than it had invested in the land banks ($9,000,000). See S. Rep. No. 1201, 84th Cong., 1st Sess., 5, 7.

As time passed, Congress watched the land bank system develop as planned. The temporary Government capitalization that had solidified the program in its inception was gradually replaced by private capital, and by the end of 1947, the Government's capital had been completely returned. S. Doc. No. 7, 84th Cong., 1st Sess., 4; S. Rep. No. 1201, 84th Cong., 1st Sess., 7. The land banks became totally private concerns—owned, operated, and financed by farmers without Government assistance.

Congress also watched the development of the Banks for Cooperatives and became concerned about their lack

of success in attracting and keeping private investment. By the 1950's, the Government still retained over 88% of the stock in the Banks. In § 2 of the Farm Credit Act of 1953, 67 Stat. 390, 12 U. S. C. § 636a, Congress stated that "[i]t is declared to be the policy of the Congress to encourage and facilitate increased borrower participation in the management, control, and ultimate ownership of the permanent system of agricultural credit made available through institutions operating under the supervision of the Farm Credit Administration . . . ." A Federal Farm Credit Board was created for the purpose, *inter alia,* of making recommendations concerning the best way to convert the Banks for Cooperatives from predominantly Government-owned to predominantly privately owned institutions.

The result of the Board's report and recommendations was the Farm Credit Act of 1955, 69 Stat. 655. It sought to effectuate Congress' policy by providing for the orderly withdrawal of Government capital from the Banks and the continual influx and retention of substitute private financing. See S. Doc. No. 7, 84th Cong., 1st Sess., 6; S. Rep. No. 1201, 84th Cong., 1st Sess., 1; Hearings on Farm Credit Act of 1955 before the House Committee on Agriculture, 84th Cong., 1st Sess., 30–31.

## II

Under the Farm Credit Act of 1933, there was only one class of capital stock in the Banks for Cooperatives. The Farm Credit Act of 1955 provided for three distinct classes of stock—A, B, and C.

Class A stock may only be held by the Governor of the Farm Credit Association on behalf of the United States. Whatever stock the Government held in the Banks prior to the 1955 Act was converted to Class A stock. This stock is nonvoting and receives no divi-

dends. Class A stock must be retired each year in an amount equal to the amount of Class C stock issued during the year. 12 U. S. C. § 1134d (a)(1). Once the United States' stock is completely redeemed, the Government will invest no more in the Banks, except that it may purchase additional shares of the Class A stock if an emergency makes it necessary in order for the bank to meet the credit needs of eligible borrowers.[8] See 12 U. S. C. §§ 1134d (a)(1), 1134b, 1134i.

Class B stock represents a new approach to capitalizing the Banks. It is an investment stock available to the public. It pays noncumulative dividends upon certain conditions. Class B stock may be retired only after all Class A stock. 12 U. S. C. § 1134d (a)(2).[9]

Class C stock may be issued only to farmers' cooperative associations, except that each regional bank is required to purchase such shares from the Central Bank. This stock may be obtained under four circumstances. One share is required to initially qualify any association as a borrower of a regional Bank. Each borrower must then make the quarterly stock purchases which gave rise to this lawsuit. In addition, 12 U. S. C. § 1134l (b) provides that after certain expenditures are made each year, patronage refunds may be allocated to borrowers in the form of Class C stock. "All patronage refunds shall be paid in the proportion that the amount of interest earned on the loans of each

---

[8] There is evidence in the record that the Government capital is being revolved out of the Banks just as Congress anticipated. See Farm Credit Administration, Banks for Cooperatives—A Quarter of a Century of Progress, excerpted in App. 157, 175. See also 431 F. 2d 1320, 1332, and n. 17 (Godbold, J., dissenting); Brief for the United States 7.

[9] The Class B shares are of only nominal importance. In 1963, they amounted to only some 5% of the total outstanding stock of the New Orleans Bank.

borrower bears to the total interest earned on the loans of all borrowers during the fiscal year." *Ibid.*[10] Borrowers also receive at the end of each fiscal year an "allocated surplus" credit which is payable out of the Bank's net savings. Like patronage refunds, allocated surplus is credited to each member in accordance with the proportion that the interest on its loans bears to the interest on all loans. When the surplus account reaches 25% of the total outstanding capital stock of the Bank, the excess may be distributed to members in the form of Class C stock.

Only the tax treatment of the quarterly purchases is disputed here.[11] The taxpayers correctly note that the Class C stock has attributes which would make a normal commercial stock undesirable. For example, the C stock pays no dividends;[12] it is transferable

---

[10] The patronage refunds and the allocated surplus, discussed *infra,* are not a return on the amount of capital that the borrower contributes to the Bank; they are distributions of earnings, not presently convertible to cash, but are eventually convertible just as the quarterly Class C purchases may eventually be redeemed.

[11] The Government contended in the District Court that the taxpayers should have reported the patronage dividends as income. The District Court disagreed and the Government did not appeal this point. It is not, therefore, reviewable here, and the Government does not urge that we consider it.

[12] While no formal dividends are paid on the C stock, it is apparent that the patronage dividend is in many ways equivalent to the traditional corporate dividend. As noted above, the patronage dividend is not immediately convertible to cash, but it is far from worthless. Like the usual corporate dividends, the patronage dividends are paid in proportion to stock ownership. Stock ownership is apportioned according to the amount a Bank member borrows. Thus, those who borrow the most own the most stock and receive the most patronage dividends (and surplus as well). As the Class A stock and the earlier issued Class B and Class C stock are redeemed, the C stock issued as dividends will become convertible to cash and its value will be realized at that time.

In the event of a default by a borrower, the Class C stock is

308

only between cooperatives and only under rare circumstances; additional shares do not provide additional voting power; [13] and the stock cannot be redeemed until all A, all B issued earlier or in the same year, and all earlier issued C shares have been called for redemption. These characteristics render the market for C shares virtually nonexistent.

It must be remembered, however, that the stock was intentionally given these characteristics by a Congress with definite goals in mind.[14] The legislative history of the Farm Credit Act of 1955 indicates that Congress placed much of the blame for the Bank's inability to

set off against the amount of the loan. Hence, the more patronage dividends the member receives, the more security he has in case of default.

[13] Cooperative associations are entitled to vote in polls designating nominees for appointment to the Federal Farm Credit Board, established by the Farm Credit Act of 1953, 67 Stat. 390, as amended, 12 U. S. C. § 636c, to help effectuate congressional policy; to vote in the nomination polls and elections of members of district farm credit boards established by the Farm Credit Act of 1937, 50 Stat. 703, 12 U. S. C. § 640a; and to vote in the nomination and elections of directors of the Central Bank for Cooperatives. It is normal for every member of a cooperative to have only one vote, irrespective of a disparity between the shares held. See *Frost* v. *Corporation Comm'n,* 278 U. S. 515, 536–537 (1929) (Brandeis, J., dissenting); I. Packel, The Law of Cooperatives §§ 23–24 (a), pp. 136–140 (3d ed. 1956). It is interesting that the Capper-Volstead Act, 42 Stat. 388, 7 U. S. C. §§ 291–292, permits a cooperative marketing association immunity from the Sherman Act under some circumstances, but *only* if no member is entitled to more than one vote.

[14] Cooperatives and corporations operate on different principles. Whereas the corporate structure separates control and management, the essence of a cooperative requires that these functions be integrated. And, whereas the value of corporate stock depends on ease of transferability (or marketability), the value of cooperative stock lies in the durable, long-term nature of the investment. See Nieman, Revolving Capital in Stock Cooperative Corporations, 13 Law & Contemp. Prob. 393 (1948).

repay the capital extended by the Government and to retain private capital on the provision in the 1933 legislation which permitted borrowers to redeem their stock for cash upon paying off their loans. The restrictions on redemption and transferability and the dividend prohibition were designed to obviate this difficulty and to provide both a stable membership and permanent capital, two necessities for the success of any cooperative venture.

## III

The taxpayers do not seek to deduct the cost of their initial shares in the Bank as interest. They accept the fact that these shares represent one cost of membership and that this cost is a capital expense because membership is a valuable asset in more than one taxable year. But, they argue that once they purchased their initial shares, they obtained full membership rights, and, *a fortiori*, that Congress must have intended the quarterly expenditures for stock to be a charge for borrowing money since the stock has no value. The fact is, however, that the stock purchased quarterly is indeed valuable. The amounts paid for C shares become part of the permanent capital structure of the Bank, thereby increasing the stability of the Bank and insuring its continued ability to extend credit. Each share also provides an opportunity for more patronage and surplus dividends, an ultimate right of redemption, and an asset that may be used as a set-off in case of a default on the loan. In sum, every share of stock purchased quarterly by the taxpayers is nearly as valuable as the shares purchased initially. It is therefore difficult to understand why these different purchases should receive radically different tax treatment. If Congress had required 1,000 or 100,000 shares of Class C stock to be pur-

chased before an association could borrow from the Banks, under the taxpayers' theory of the case the cost of those shares would be a nondeductible capital expense. Simply because Congress eased the burden on farmers by spreading the requirement of capital investment over a period of time rather than requiring it as a prerequisite to borrowing, the taxpayers are entitled to no more favorable tax treatment.

It is important not to lose sight of the congressional purposes in enacting the farm credit legislation. The immediate goal was to provide loans to farmers at low interest rates. It would, therefore, be odd for Congress to provide a "hidden" interest charge in the legislation. The long-range goal was to make the Banks "fully cooperative and to place full ownership and responsibility for their operations and success in the hands of those eligible to borrow from them." Hearings on Farm Credit Act of 1955 before a Subcommittee of the Senate Committee on Agriculture and Forestry, 84th Cong., 1st Sess., 60. Congress felt, in light of its experience under the Farm Credit Act of 1933, that the long-range goal could only be achieved if Bank members made long-term investments in the Banks. Hence, Congress created Class C stock, a security with a special value in cooperative ventures. While this security is *sui generis*, the congressional scheme makes it clear that it has value over the long run.

Since the security is of value in more than one taxable year, it is a capital asset within the meaning of § 1221 of the Internal Revenue Code, and its cost is nondeductible. Cf. *Commissioner* v. *Lincoln Savings & Loan Assn.*, 403 U. S. 345 (1971); *Old Colony R. Co.* v. *United States*, 284 U. S. 552 (1932); 26 CFR § 1.461–1.

We reject the contention that while the Class C

stock may be a capital asset, it is worth only $1,[15] and that the additional $99 paid for each share must represent interest. Were we dealing with the traditional corporate structure in this case, the taxpayers' argument would have strength. But, as we have pointed out previously, the essential nature of cooperatives and corporations differs. The value of the Class C stock derives primarily from attributes other than marketability. The stock has value because it is the foundation of the cooperative scheme; it insures stability and continuity. The stock also has value because it enables the farmers to work together toward common goals. It enables them to share in a venture of common concerns and to reap the rewards of knowing that they can finance themselves without the assistance of the Federal Government. It is perhaps debatable whether these attributes should properly be valued at $100 per share, but we are not called upon merely to resolve a question of valuation. Rather, we must decide whether it is artificial to characterize these unique expenditures as payments for a capital asset. We find that it is not.

The taxpayers and the Government each allege that the other is looking at form rather than substance. At some point, however, the form in which a transaction is cast must have considerable impact. Guterman, Substance v. Form in the Taxation of Personal and Business Transactions, N. Y. U. 20th Inst. on Fed. Tax. 951 (1962).

---

[15] It is by no means clear that the Class C stock is worth only $1 even under a traditional market value analysis. The lower courts failed to include the value of the patronage and surplus dividends in computing the value of the quarterly purchases. The Class C stock may, therefore, be worth considerably more than $1, although the Government concedes that it is not worth $100. Because of the result we reach in this case, we have no occasion to make a final determination as to what value the stock would have under a market-value analysis.

Congress chose to make the taxpayers buy stock; Congress determined that the stock was worth $100 a share; and this stock was endowed with a long-term value. While Congress might have been able to achieve the same ends through additional interest payments, it chose the form of stock purchases. This form assures long-term commitment and has bearing on the tax consequences of the purchases.

Accordingly, the decision of the Court of Appeals is reversed and the case is remanded with direction that judgment be entered for the United States.

*It is so ordered.*

MR. JUSTICE BLACKMUN took no part in the consideration or decision of this case.