### In re COOPERATIVA CAFETEROS DE PUERTO RICO, Bankrupt.

### Bankruptcy No. B–78–263(B).

United States Bankruptcy Court,
D. Puerto Rico.

March 17, 1982.

Ismael H. Herrero, Jr., Rio Piedras, P. R., for trustee.

Charles A. Cuprill Hernández, Ponce, P. R., for debtor.

Rafael Pérez Bachs of McConnell, Valdés, Kelley, Sifre, Griggs & Ruíz-Suria, San Juan, P. R., for Baltimore Bank for Cooperatives.

Enrique Alvarez Vicente for Creditors' Committee.

### ORDER

W. H. BECKERLEG, Bankruptcy Judge.

The Baltimore Bank for Cooperatives filed on November 10, 1981 an application for turn over of $215,096.59 held in escrow by this court pursuant to a memorandum of escrow agreement entered into on Sept. 25, 1981 by said bank and the trustee.

The trustee opposed and the parties were heard on January 15, 1982, on which date the parties were granted terms to file memoranda. Those terms have expired and we consider the matter submitted for decision.

The bankrupt was a member stockholder of the Baltimore Bank for Cooperatives; it was also a borrower and the Bank held a lien on the bankrupt's assets. On Sept. 25, 1981, the trustee sold off certain of the assets and from the receipts of the sale liquidated the account with the bank. In

---

**35.** See note 33, *supra.*

that liquidation, the Bank agreed to give the trustee credit for the bankrupt's stockholdings, but the parties were unable to agree on the amount of the credit. The trustee insisted on the face value of the stocks, that is $548,141.16, and the Bank insisted on their discounted present value, or $333,044.57. By the memorandum of escrow agreement of Sept. 25, 1981, the parties agreed that the difference between the face value and the discounted value should be deposited in escrow with the Clerk of this court until the controversy be resolved; the amount of $215,096.59 was deposited with the Clerk and we are called upon to resolve the controversy.

The applicable statute is the Farm Credit Act of 1971[1], as amended, pursuant to which Congress established and continued as federally chartered instrumentalities, banks for cooperatives[2]. These banks, of which the moving party is one, is a body corporate authorized to make loans and commitments for credit, among other things[3]. The banks are authorized to have capital stock in the amount required to permit to have adequate capital to meet the credit needs of its borrowers, and the capital stock is divided into shares with a par value of $100 each[4]. The stock may be voting or non-voting[5], (or participation certificates may be issued in lieu of non-voting stock[6]). Any association of farmers are eligible to borrow from a bank for cooperatives[7], but a borrower must at the time a loan is made own at least one share of voting stock and is required to invest in additional voting or non-voting stock in such amount as the lending bank may require[8]. These additional stock ownership requirements may be based on the borrower's loan from the bank or some feature of the loan and is intended to

"... provide adequate capital for the operation of the bank and equitable ownership thereof among borrowers."[9]

The immediate statutory language with which we are presently concerned here is # 3.10(d)[10]. This paragraph provides:

"In any case where the debt of a borrower is in default, or in any case of liquidation or dissolution of a present or former borrower from a bank for cooperatives, the bank may, but shall not be required to, retire and cancel all or part of the stock... at the fair market value thereof not exceeding par.

... In no event shall the bank's equities be retired or cancelled if the retirement or cancellation would adversely affect the bank's capital structure..."

We read # 3.10(d) in the light of its predecessor language and history as found in *U. S. v. Mississippi Chemical Corporation*, 405 U.S. 298, 301–312, 92 S.Ct. 908, 910–916, 31 L.Ed.2d 217 (1972), wherein the court stated:

"It must be remembered, however, that the stock was intentionally given these characteristics by a Congress with definite goals in mind. The legislative history of the Farm Credit Act of 1955 indicates that Congress placed much of the blame for the Bank's inability to repay the capital extended by the Government and to retain private capital to the provision on the 1933 legislation which permitted borrowers to redeem their stock for cash upon paying off their loans. The restrictions on redemption and transferability and the dividend prohibition were designed to obviate this difficulty and to provide both a stable membership and permanent capital, two necessities for the success of any cooperative venture."

1. 12 U.S.C. § 2001 et seq.

2. 12 U.S.C. § 2121.

3. 12 U.S.C. § 2122(6).

4. 12 U.S.C. § 2124(a) and (b).

5. 12 U.S.C. § 2124(c) and (e).

6. 12 U.S.C. § 2124(f).

7. 12 U.S.C. § 2129.

8. 12 U.S.C. § 2130(a).

9. 12 U.S.C. § 2130(a).

10. 12 U.S.C. § 2131(d), as amended by Pub.L. 96–592, Title III, # 307, Dec. 24, 1980, 94 Stat. 3445.

We read the statute as granting the bank the option to retire, (i.e., redeem) the stock of the bankrupt; the bankrupt, and thus the trustee has no right to demand that the stock be retired—that right, under the statute, does not mature and is not exercisable, except at the bank's option.

We also read the statute granting further protection to the bank by not requiring the bank to pay more than the fair market value; the bank could pay more apparently, but is not required to do so.

These foregoing interpretations of the statute are in harmony with what we understand Congress had in mind when the language restricting redemption and transferability was adopted.

We, therefore, turn to the question of what is "fair market value". By definitions of the same statute this term is not more than par value, so by inference it may be less than par value. What is "market value" and what is a "fair market value" of a stock that is not transferable and is really a compulsory investment required of all borrowers from the bank, is difficult to say, but the value assigned by the bank in the present case is certainly one possible definition and one with which we are familiar with in the bankruptcy field, particularly in these days of high interest. The discounted value or present value appears to us to be a proper and fair method of determining "fair market value". Furthermore, to determine such value one must assume an interest rate, and the rate in fairness must be the rate prevailing at the time.

The application of the Baltimore Bank for Cooperatives is granted.