MISSISSIPPI CHEMICAL CORPORA-
TION, Plaintiff-Appellee,

v.

UNITED STATES of America,
Defendant-Appellant.

COASTAL CHEMICAL CORPORATION,
Plaintiff-Appellee,

v.

UNITED STATES of America,
Defendant-Appellant.

No. 28271.

United States Court of Appeals,
Fifth Circuit.

Sept. 14, 1970.

Godbold, Circuit Judge, dissented and filed opinion.

Robert E. Hauberg, U. S. Atty., Jackson, Miss., Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, Meyer Rothwacks, Robert I. Waxman, Thomas L. Stapleton, Attys., Tax Division, U. S. Dept. of Justice, Washington, D. C., for appellant.

John C. Satterfield, J. Dudley Buford, Hollaman M. Raney, Yazoo City, Miss., for appellees; Satterfield, Shell, Williams & Buford, Yazoo City, Miss., of counsel.

Mac Asbill, Jr., Washington, D. C., for Penn Yan Agway Cooperative, Inc., amicus curiae.

Before GEWIN, GODBOLD and CLARK, Circuit Judges.

GEWIN, Circuit Judge:

The government appeals from separate judgments entered for Mississippi Chemical Corporation and Coastal Chemical Corporation (hereinafter, taxpayers) in their suits for refund of federal taxes. Taxpayers based their claims for refund on the contention that $99 of each $100 expended for the purchase of certain Class C stock in the New Orleans Bank for Cooperatives constituted deductible expenses in the year of purchase. The government contended that these amounts were the nondeductible costs of acquiring capital assets. The district court concluded that the payments were deductible as interest expenses, and we affirm.

Taxpayers are Mississippi corporations with their principal place of busi-

ness in Yazoo City, Mississippi. During the tax years in question they were "cooperative associations" as defined in the Agricultural Marketing Act.[1] Taxpayers are stockholders in, and borrowers from, the New Orleans Bank for Cooperatives (hereinafter, the Bank). The Bank is part of a banking system created by the federal government [2] during the depression to provide low cost loans to farmer's marketing, purchasing, and service cooperatives. It is one of the twelve regional banks in the system and serves Louisiana, Mississippi, and Alabama.

The governing legislation [3] provides for three classes of stock in a regional bank. Class A stock represents the original capital contributed by the United States. These shares are non-voting and pay no dividend. The legislation contains a scheme of retirement for Class A shares which is dependent on the amount of Class C stock purchased and on the net profits of the regional bank. Class B stock may be issued to any person. It is non-voting but may bear a dividend not to exceed four percent per annum. Class C stock may only be issued to banks for cooperatives and to farmers' cooperative associations. It pays no dividend. Each holder of Class C stock is entitled to one vote, though a cooperative has only the single vote regardless of the number of Class C shares held.

Farmers cooperatives, like taxpayers, acquire Class C shares in three ways: (1) Each cooperative must purchase a qualifying share of Class C stock to be eligible to borrow from the Bank. (2) A borrower cooperative is required to make quarterly investments in Class C stock; these purchases are referred to as "interest override" payments. The amount required to be invested is not less than ten nor more than twenty-five percent of the interest payable by the borrower for that quarter, to be determined by the Bank's directors.[4] (3) Class C stock is also received by farmers' cooperatives as a distribution of the Bank's net profits during a fiscal year. These distributions, called "patronage refunds", are computed in amount "in the proportion that the amount of interest earned on the loans of each borrower bears to the total interest earned on the loans of all borrowers during the fiscal year." [5]

Mississippi Chemical Corporation acquired its qualifying share of Class C stock in 1956; Coastal Chemical Corporation purchased its share in 1957. Each carried its initial share on its books at the $100 cost, and neither sought a deduction for any part of this expense. These qualifying shares were not involved in the suit below.

Mississippi Chemical's suit concerned the fiscal years ending 30 June 1961, 1962, and 1963. As a result of its borrowings during those years it was required to make "interest override" purchases of 189, 169, and 193 shares of Class C stock respectively. The purchase price of each share of stock was $100. In its tax returns for each year, Mississippi Chemical reported $1 per share as the cost of acquiring a capital asset and claimed a deduction in the amount of $99 a share as an interest expense. In the same fiscal years, Mississippi Chemical received "patronage refunds" of 287, 275, and 251 shares of Class C stock respectively. It reported $1 per share of the "patronage refund" as a reduction of interest expense and investments, but it made no report of the remaining $99 of par value of each share.

Coastal Chemical's suit involved a longer period of time including the fiscal years ending 30 June 1958 through 1963. In these years Coastal Chemical purchased 118, 339, 473, 417, 351, and 421 shares of Class C stock respectively pursuant to the "interest override" requirements. During the same years, it received 143, 474, 516, 605, 523, and 630 shares of Class C stock as "patronage re-

---

1. 12 U.S.C. § 1141j.

2. 12 U.S.C. § 1134.

3. 12 U.S.C. § 1134d.

4. The rate for the New Orleans Bank during the periods in question was 15%.

5. 12 U.S.C. § 1134*l*(b).

funds." In its tax returns for these periods, Coastal Chemical treated the shares purchased and those received as "patronage dividends" in the same manner as Mississippi Chemical.

The Commissioner disallowed the interest deduction claimed by each taxpayer and asserted deficiencies. Taxpayers paid the deficiencies and filed claims for refund which were disallowed. Taxpayers then instituted their actions which were consolidated for trial in the district court. The court below upheld the taxpayer's contention that $99 of each $100 expended for the purchase of a share of Class C stock was deductible as an interest expense. In the district court the government also contended that taxpayers should have reported the Class C stock received as patronage refunds as income. The court did not sustain this position and it has been abandoned by the government.[6] As a result the present appeal is concerned solely with the tax treatment of the Class C stock purchased under the "interest override" requirements of 12 U.S.C. § 1134d(a) (3).[7]

**I**

Central to the district court's decision was its finding that the Class C stock,[8] while not worthless, was without any appreciable market value and had at most a nominal value. This conclusion is attributable to the peculiar nature of these shares. Taxpayers could only sell or transfer Class C stock to another qualified farmers' cooperative with the authorization of the Bank's Board of Directors and the approval of the Farm Credit Administration. No share of the Bank's Class C stock has ever been sold by a cooperative,[9] so there is obviously no market in this stock that would aid evaluation.

Additional characteristics of the stock severely limit its value in the hands of the taxpayers. It pays no dividend and has no growth potential. After the purchase of their initial, qualifying shares, taxpayers gained no voting rights by the purchase of additional Class C stock. The Bank has a first lien on all Class C shares.[10] While the governing legisla-

---

6. In a footnote to its brief the government states:

> The Government also contended in the lower court, that the taxpayers should have reported the patronage dividends (refunds) of shares of Class C stock during the taxable periods in issue as income. The lower court refused to sustain that contention. The Government has not appealed from that part of the judgment.

In this connection the following argument is advanced by amicus curiae:

> By failing to appeal from the decision below that Class "C" stock received as patronage refunds must be included in plaintiffs' income only to the extent of $1 per share, the government in effect concedes that the fair market value of such stock is no more than $1 per share. Clearly the same standard must apply in assessing the value of the identical stock which is purchased pursuant to the requirements of a loan agreement.

*See* Commissioner of Internal Revenue v. Carpenter, 219 F.2d 635 (5th Cir. 1955) ; Long Poultry Farms v. Commissioner of Internal Revenue, 249 F.2d 726 (4th Cir. 1957) ; Treas.Reg. § 1.61–5(b) (1) (iv) (1959).

7. The same question has been involved in two recent cases. In Penn Yan Agway Cooperative, Inc. v. United States, 417 F.2d 1372 (Ct.Cl.1969), the Court of Claims held that amounts paid for Class C shares of the Springfield Bank for Cooperatives under the "interest override" requirements were currently deductible as interest. In M.F.A. Central Cooperative v. Bookwalter, 286 F.Supp. 956 (E.D.Mo.1968), the district court allowed current deduction of the cost of Class C shares in the St. Louis Bank for Cooperatives, but considered it an ordinary and necessary business expense rather than interest. On appeal the Eighth Circuit reversed the district court and held that the cost of Class C shares was not currently deductible. M.F.A. Central Cooperative v. Bookwalter, 427 F.2d 1341 (8th Cir. 1970).

8. The New Orleans Bank does not issue certificates for the Class C shares. Thus, Class C shares are really only credits entered on the books of the bank in units of $100 and fractional parts thereof.

9. The Bank's Class C shares have changed hands only at the liquidation of a cooperative or its merger with another.

10. 12 U.S.C. § 1134d(c).

tion provides that Class C shares may be retired at some date in the future, retirement will be at par ($100) and must await the prior retirement of all Class A stock and all senior Class B shares. Retirement is also subject to the discretion of officials of the bank system. Until this uncertain retirement date,[11] the shares have no value to taxpayers in the usual sense. The Bank will not accept Class C shares in satisfaction of future "interest override" obligations, nor will it accept Class C shares as collateral for a loan. These factors, the limited marketability and limited value of the shares themselves, make application of the normal "willing buyer and willing seller" standard, for determining fair market value,[12] unfeasible.

The government appears to concede that these shares have no market value,[13] but urges that they possess an "intrinsic" or "intangible" value in taxpayers' hands which renders their cost a capital investment. First, it contends that taxpayers benefit from low cost loans and other Bank services because of the existence of the banking system assured through their continued purchases of Class C stock. As has been noted, however, the right to Bank services is established by the purchase of the initial qualifying shares. The government also points to the history of the Banks for Cooperatives[14] which evidences a Con-

gressional intention ultimately to withdraw all government investment from the system. This is to be accomplished by the retirement of Class A stock as the federal investment it represents is replaced by Class C investment through purchases by cooperatives and receipt by them of "patronage refunds." The government urges that when all Class A stock has been retired, the revolving fund method of capitalization, common to cooperative financing, will prevail and the participating cooperatives will be the sole owners of a valuable financial institution. It should be noted that ownership here is not synonymous with control:

> Prior to 1964, the holders of class C stock of each [regional] bank could elect only one of its seven directors, and since 1964, they have elected two of the seven. The other five directors are elected by the local district Production Credit Associations (two members), and the local district Federal Land Bank Associations (two members), with the seventh being appointed by the Governor of the Farm Credit Administration.[15]

With their share of control in the Bank thus limited, the fact that Class C shareholders were having capital they supplied substituted for that previously furnished by the government can scarcely be seen as enhancing the value of their shares.

11. For purpose of valuation, the *Penn Yan* court accepted 30 or 31 years as the period required before the stock would be retired based on the history of the Springfield Bank. It is not clear to what extent this figure reflected the discretion of the bank officials or other factors which could operate to defeat or prolong recovery.

12. [Fair market value] is the price at which property will change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the facts.
Willow Terrace Dev. Co. v. Commissioner of Internal Revenue, 345 F.2d 933, 936 (5th Cir. 1965).

13. The Government states in its brief:
In truth, because of the special characteristics of the stock there is no

reasonable and determinable market value which can be assigned to it. As one authority puts it [Packel, Law of Cooperatives (3d ed.), Sec. 45 (d) at 234.]:
The circumstances surrounding the issuance of revolving fund certificates are often such that no particular market value can be ascribed to the certificate even though it refers to a sum certain.

14. The history, organization, and capital structure of the Banks for Cooperatives is discussed by the court in Penn Yan. 417 F.2d at 1373–1376.

15. Penn Yan Agway Cooperative, Inc. v. United States, 417 F.2d 1372, 1375 (Ct. Cl.1969).

In Penn Yan Agway Cooperative, Inc. v. United States,[16] the Court of Claims rejected the same government argument —that the Class C shares possessed intangible value. The court stated:

> [T]he cold fact remains that when plaintiff cooperative shareholder paid the $407 for the 4.07 shares, it received stock which was greatly less valuable from an economic and financial standpoint than the purchase price required by law and the terms of the loan agreements. The "intangible benefits" bestowed by Congress on farmers' cooperatives generally do not alter this fact. * * * The required purchase of such stock gave plaintiff no economic or financial benefit other than the circumstance that it could not have obtained the loan with its favorable interest rate without fulfillment of the statutory requirement. But in the extremely practical field of taxation, in which substance prevails over form, it cannot reasonably be concluded under the circumstances that Congress has granted favors to cooperatives in furtherance of agricultural policies and taken them away (on the theory of intangible benefits) in whole or part in the field of raising of public revenues. It is obvious under the facts of this case that plaintiff did not consider, nor could it reasonably be held to have considered, that its required payment of $407 for such stock, was an investment, as no return on such purported investment could be realized, except repayment of the bare purchase price delayed for many years.[17]

In *Penn Yan*, the cooperative shareholder assigned a value of $6.90 to its Class C shares and introduced expert testimony tending to support this general figure as a reasonable estimate of the shares' fair market value. The Court of Claims approved the cooperative's evaluation. In M.F.A. Central Cooperative v. Bookwalter,[18] the district court concluded that Class C shares in the St. Louis Bank for Cooperatives had no fair market value at all. This conclusion was reversed by the Eighth Circuit which stated, "While the Class C stock has no established market value, it has a substantial book value and while it is likely not worth its par value at the time it is issued, it certainly has substantial value."[19] It should be noted that there is a considerable difference, as to the factors affecting value, between the shares of the St. Louis bank and those involved here.[20] In the present case, considering the nature of the Class C stock and the testimony as to its value adduced in the district court, that court was not clearly erroneous in determining that the Class C shares had no fair market value and no more than a nominal value to the taxpayers.[21]

## II

Notwithstanding the absence of a fair market value for the Class C shares, the government contends that taxpayers were not entitled to deduct any portion of their purchase price. It cites Montana Power Co. v. United States,[22] contending:

> If one buys something and pays more than it is worth, and more than he

16. 417 F.2d 1372 (Ct.Cl.1959).

17. *Id.* at 1377–1378.

18. 286 F.Supp. 956 (E.D.Mo.1968).

19. M.F.A. Central Cooperative v. Bookwalter, 427 F.2d 1341 (8th Cir. 1970).

20. From statements contained in briefs filed in this court, it appears that by June 30, 1967 the St. Louis Bank had completely retired its Class A shares and substantially reduced the amount of Class B investment. As a consequence it was able to redeem all Class C shares issued during the fiscal year ending June 30, 1956. The M.F.A. Cooperative had purchased St. Louis Class C shares from other cooperatives, and it appears that transactions between cooperatives were not uncommon.

21. Rule 52(a) Fed.R.Civ.Pro.

22. 159 F.Supp. 593, 595, 141 Ct.Cl., 620 cert. denied, 358 U.S. 842, 79 S.Ct. 23, 3 L.Ed.2d 76 (1958).

can resell it for, there are no immediate tax consequences of this everyday occurrence. * * * He must "realize" his bad bargain, his loss, by selling.

We do not dispute the soundness of this tax principle, but consider it inapplicable to the present case.[23] The government advanced the same argument in the *Penn Yan* case. The Court of Claims rejected it stating:

[I]t would be unfair and unjust to apply such a doctrine in the circumstances where disposition by the plaintiff of the class C stock was a practical impossibility due to lack of a market, which resulted from the statutory restrictions placed upon such stock under the capitalization formula prescribed by law for the banks for cooperatives.[24]

*Montana Power* and the other cases relied on by the government are readily distinguished from the present situation. Taxpayers in the instant case have not been the victims of a bad bargain in the traditional sense;[25] they were required to make continued purchases of Class C stock in order to secure loans from the Bank. Neither did taxpayers acquire an asset of continuing value, though less than the purchase price;[26] the Class C shares were of no appreciable value to the taxpayers. It is at odds with the incisive realism required in determining the tax consequences of ambiguous transactions to treat these purchases as "investments"; they were something else.[27]

We agree with the trial court and with the Court of Claims in *Penn Yan*, that the purchase price of the Class C stock (in excess of the nominal value assigned it by taxpayers) is deductible as interest in the year of purchase. Section 163(a) of the Code[28] provides, "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." The interest which is deductible under this section is defined as, "the amount one has contracted to pay for the use of borrowed money."[29] As we have noted the Class C stock was without practical value to the taxpayers. Their only reason for acquiring the shares was as a prerequisite for continued borrowing from the Bank. It was in effect a bonus or premium paid in addition to the usual interest, and comes within the meaning of interest under 163(a)[30] The *Penn Yan* court supported its similar decision with the proposition borrowed from usury cases that:

[I]f as a condition to the making of a loan at an apparently permissible rate of interest, the lender requires the borrower to sell property to him at less than its value or to purchase property from him at an excessive

---

23. *See* Ancel Greene & Co. v. Commissioner of Internal Revenue, 38 T.C. 125 (1962); McMillan Mortgage Co. v. Commissioner of Internal Revenue, 36 T.C. 924 (1961). These cases are thoroughly discussed in Penn Yan. 417 F.2d at 1380–1381.

24. 417 F.2d at 1379.

25. *See* Montana Power Co. v. United States, 159 F.Supp. 593, 141 Ct.Cl. 620 (1958).

26. *See* Dresser v. United States, 55 F.2d 499, 512, 74 Ct.Cl. 55, cert. denied, 287 U.S. 635, 53 S.Ct. 85, 77 L.Ed. 550 (1932); Koppers Co. v. United States, 278 F.2d 946, 949 (Ct.Cl.1960).

27. Our decision on this point appears to be at odds with that of the Eighth Circuit in M.F.A. Central Cooperative v. Bookwalter, 427 F.2d 1341 (8th Cir.

1970). Insofar as that court's decision is not attributable to the difference in value of the St. Louis shares, we are simply unable to agree. If we concluded, as did the Eighth Circuit, that the "interest override" payments were made to acquire Class C shares as capital assets, we would agree that recognition of gain or loss must ordinarily await realization through sale or exchange. However, we agree with the court below that, for tax purposes, the bulk of these payments were not *actually* made to acquire an asset.

28. 26 U.S.C. § 163(a).

29. Old Colony R. R. v. Commissioner of Internal Revenue, 284 U.S. 552, 560, 52 S.Ct. 211, 213, 76 L.Ed. 484 (1932).

30. Wiggin Terminals, Inc. v. United States, 36 F.2d 893 (1st Cir. 1929); L–R Heat Treating Co. v. Commissioner

price, the difference. represents interest. * * *[31]

In *M.F.A.*, the district court held that the amounts paid by the plaintiff cooperative for Class C shares of the St. Louis Bank for Cooperatives were not deductible as interest under § 163(a),[32] but allowed a current deduction as an ordinary and necessary business expense under § 162(a).[33] The district court distinguished the cases allowing interest deductions for amounts paid as a bonus or premium to induce a loan,[34] since the debtors in those cases received nothing in return for the bonus but the use of the loaned money while the M.F.A. Cooperative had received Class C stock. Because, of the peculiar nature of the Class C shares, we find this distinction unacceptable. As the district court itself observed:

> This Class C stock purchased quarterly was of absolutely no use or benefit to M.F.A. Central Cooperative. * * * The only reason it was purchased was because M.F.A. Central wanted to borrow money from the St. Louis Bank for Cooperatives and the agreement to purchase Class C stock was imposed as a condition of the loan. It is impossible to separate the loan from the purchase of the stock. One was the motivation for the other.[35]

The district court in *M.F.A.* also considered the loan agreement as significant evidence that the parties understood the obligation to purchase the Class C stock

to be apart from the interest requirements. We do not feel that the attitude of the parties is controlling. We agree with the Court of Claims in *Penn Yan* that a current deduction was proper and that the appropriate deduction lies under § 163(a).[36] As that court noted this is more logical than the § 162(a) treatment initially given the expenses by the district court in M.F.A., "particularly because the amount of such stock required to be purchased by law and by the loan agreements involved was measured by a percentage of the interest payable on plaintiff's outstanding loan obligations to the bank issuing the stock"[37]

Accordingly, the judgment of the district court is affirmed.

GODBOLD, Circuit Judge (dissenting):

The majority opinion is a demonstration of what one of the few authorities on the law of cooperatives has counselled against:

> The entire field of cooperative corporation law is so relatively new, the basic principles of the cooperative plan are so fundamentally different from those of corporations for profit, and the temporary or interim character of the capital required for proper functioning of a cooperative is so different from the permanent share capital of other business corporations, that even well established concepts in the field

---

of Internal Revenue, 28 T.C. 894 (1957); Court Holding Co. v. Commissioner of Internal Revenue, 2 T.C. 531, 536 (1943), rev'd on other grounds, 143 F.2d 823 (5th Cir. 1944), court of appeals rev'd and tax court aff'd on other grounds, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 567 (1945). These cases are offered for the same proposition by the Court of Claims in Penn Yan. 417 F.2d at 1379.

31. 417 F.2d at 1379; quoting, Memorial Gardens of Wasatch v. Everett Vinson & Assoc., 264 F.2d 282, 285 (10th Cir. 1959).

32. While the Eighth Circuit reversed the district court insofar as it allowed a deduction as a business expense, it adopted

the district court's opinion on the question of interest. M.F.A. Central Cooperative v. Bookwalter, 427 F.2d 1341 (8th Cir. 1970).

33. 26 U.S.C. § 162(a).

34. See note 30 *supra*.

35. 286 F.Supp. at 961.

36. The quid pro quo for taxpayer's present deduction for an interest expense will arise when and if the Class C shares are redeemed. In that event taxpayers must take $99 into ordinary income. J. Chommie, Federal Income Tax § 17 at 33 (1968); 1 J. Mertens, Federal Income Tax § 7.34 et seq. (1969).

37. 417 F.2d at 1382.

of business corporation law cannot safely be applied to cooperative corporations without careful understanding of the reasons underlying those principles and the applicability or inapplicability of those reasons to co-operatives. The fable of the three blind men's impressions of an elephant holds a pointed moral for judges and lawyers approaching the problems of cooperative corporation law and, particularly, the problems of financial structure and operation of cooperatives. Revolving capital cannot be assumed to result from the creation of either an exclusively debtor-creditor relationship or an exclusively corporation-shareholder relationship. Rather it involves a blending of certain elements of both, and frequently something new has been added as well. The resultant product is *sui generis*. In the long run, the public interest will best be served by thorough, patient, and understanding comprehension of what participants in a cooperative enterprise are trying to achieve, rather than by unwarranted assumption that new legal relationships arising from cooperative business transactions and organizations must be neatly and quickly, albeit somewhat forcibly, classified according to preexisting legal concepts developed under different conditions for different purposes in different kinds of transactions and organizations.

Nieman, Revolving Capital in Stock Cooperative Corporations, 13 Law and Contemporary Problems 393 at 402 (1948).

The taxpayers are incorporated farmers' cooperatives. In issue is the tax treatment of amounts which they have paid for Class C stock which they hold of the New Orleans Bank for Coopera-

tives, an incorporated stock cooperative of which they are members and from whom they borrow.[1] The taxpayers say on the one hand that the amounts were not paid for a capital asset, which under 26 U.S.C. (1964 ed.) § 1221 is "property held by the taxpayer" (with designated exceptions none of which is contended to be applicable). They say that in truth all or substantially all of the amounts paid, though cast in the form of the purchase price of capital stock, really were amounts which they had contracted to pay for the use of borrowed money and therefore were interest.[2] As probative of both of these contentions their underlying argument is that the Class C stock lacks many of the usual characteristics of stock and that it has only nominal value. The government contends the stock is a capital asset, and, recognizing that it may not have fair market value in the usual sense of a willing buyer and a willing seller, says it has intrinsic value.

Once one grasps the function of this particular stock in an institution organized by the Congress as a cooperative[3] it is seen that the stock is a capital asset, "property held by the taxpayer," although it does not have the usual characteristics of stock in a commercial enterprise organized under general corporation laws. Once that is seen—if not before—the contention that the payments for Class C stock are interest falls.

The Eighth Circuit, in M.F.A. Central Cooperative v. Bookwalter, 427 F.2d 1341, has reached the same conclusion which I reach. That court held that the required quarterly investments in Class C stock were payments for capital assets. It affirmed the holding of the District Court[4] that the payments were not interest, and reversed the holding that

---

1. The purchases were made by Coastal between 1958 and 1963 in the total amount of $211,799.68, and by Mississippi Chemical between 1961 and 1963 in the total amount of $55,113.19. Tax refunds ordered by the District Court are $265,044.35 to Coastal and $85,298.51 to Mississippi Chemical.

2. *E. g.* Old Colony R. Co. v. Commissioner of Internal Revenue, 284 U.S. 552, 52 S.Ct. 211, 76 L.Ed. 484 (1932).

3. Under a charter issued by the Farm Credit Administration.

4. M.F.A. Central Cooperative v. Bookwalter, 286 F.Supp. 956 (E.D.Mo.1968).

they were ordinary and necessary business expenses. In so doing it considered Penn Yan Agway Cooperative v. United States, 417 F.2d 1372 (Ct.Cl.1969) and the District Court opinion in the present case and would not follow them.[5]

**1.**

Central to this case is the fact that the New Orleans Bank for Cooperatives is itself a cooperative. "A cooperative is an association which furnishes an economic service without entrepreneur profit and which is owned and controlled on a substantially equal basis by those for whom the association is rendering service. * * * '[E]ntrepreneur profit' * * * really represents the antithesis of the benefits normally ascribable to cooperatives. 'Entrepreneur profit' is used in the true economic sense of a return for the speculative or risk element in an enterprise. In a cooperative, all the members assume, in a broad sense, the economic risk, and they contemplate no return for the undertaking of the risk." Packel, The Law of Cooperatives, § 1, pp. 2–3 (3d ed.).

"The primary objective of an ordinary cooperative is not charitable. * * In the normal case * * * the cooperative is designed to further the economic interest or welfare of its members. Economic welfare does not merely refer to financial savings or increased monetary returns. It cuts much deeper and takes into consideration basic aspects of economic life. Quality of product, decency of service, ownership, control and satisfaction of self-help are important benefits of cooperatives and sometimes are even more important than the direct financial benefits." *Id.* at pp. 6–7.

Among the normal attributes of a cooperative are:

> \*      \*      \*      \*

(3) transfer of ownership interests is prohibited or limited;

(4) capital investment receives either no return or a limited return;

(5) economic benefits pass to the members on a substantially equal basis or on the basis of their patronage of the association;

*Id.* at 3.

Justice Brandeis pointed out in his dissent in Frost v. Corporation Commission, 278 U.S. 515, 536, 49 S.Ct. 235, 73 L.Ed. 483, 495 (1929) that farm cooperatives seek, in addition to the immediate and direct financial advantage of members, a type of economic democracy as well in which there is equitable assumption of responsibilities and equitable distribution of benefits, and that in addition to financial benefits they promote and effect cooperation among farmers. These objectives, coupled with that of economic strength springing from the combination in a single institution of the combined effort and contributions of all, is important in grasping the relationship between the appellant cooperatives and the cooperative financial institution from which they borrow.

**2.**

As Professor Nieman points out, the capital of a cooperative, insofar as permanence or impermanence of shares of stock or other units of capital is concerned, is essentially different from the capital of other business corporations.[6] The commercial shareholder does not anticipate his contribution to capital will be returned to him until dissolution. Prior to dissolution he can recover his contribution by selling his shares to another.

A cooperative's capital, however, more often represents essentially a loan or temporary contribution by its patrons to finance certain economic services for them. The patron-member or patron-shareholder expects that the capital which he contributes will be

---

5. *Penn Yan* held that the purchase price of Class C stock was interest to the extent that it exceeded $6.60 per share, which the taxpayer conceded was its value.

6. Nieman, *supra,* at 393.

returned to him prior to dissolution, but not until his own and other patrons' subsequent contributions to capital render his earlier contribution unnecessary to finance the cooperative's facilities and operations. He does not expect to wait until dissolution, and he knows that his share are not readily salable. He looks to the cooperative to return his capital contributions to him if, and as soon as, it can do so.

*Nieman, supra,* at 393–394. This concept is a formalization of early, informal cooperative arrangements.[7] As cooperatives became more permanent and more continuous in their operations the patron who temporarily put his capital at the service of the group, footnote 7, *supra,* no longer took it home with him when his transaction was over but left it for the use of the continuing activity, though not for its permanent use. But the bedrock principle remained that he received no return or a limited return on his investment in capital.

Most of the formalized early cooperatives were corporations, which organized and structured their capital under the general corporation laws, the only laws available, though unrelated to the particular capital requirements of the cooperative. *Id.* at 393 and 395. "There ever since has been a trial-and-error effort to develop for cooperatives a kind of capital more adequately suited to their peculiar needs and still within the corporate form." *Id.* at 395.[8]

As cooperatives evolved, necessity imposed the creation of a new kind or tem-

porary of interim capital, revolving fund capital.

Provision frequently was made for the return of a member's share of the capital upon the termination of his membership. The risk to the cooperative's financial integrity in the event that a substantial number of members should withdraw and demand the return of their membership capital at the same time required modification of the right to demand a return of membership capital promptly upon termination of membership. Provision was made to suspend the rights and privileges of membership or to retain the member's share of the capital until such time as the cooperative should be financially able to pay it out without undue prejudice to other members or creditors. The problems incident to the existence of permanent capital, even membership capital repayable upon termination· or suspension of membership or reasonably soon thereafter, eventually were met by the creation of a new kind of temporary or interim capital which has now become quite common, although peculiar to cooperatives—that is, revolving-fund capital.

*Id.* "The revolving fund plan 'has been likened to a water wheel, picking up water, using it to create the power that turns the mill machinery, and returning the water to the millstream.'" *Id.* at 396. As the fund of capital becomes adequate it is maintained at that level by continuing to receive each year new con-

7. "When more than a century ago, a group of Ohio farmers joined together to ship their cattle to market at Pittsburgh, each of them presumably furnished his share of the cattle, wagons, and equipment which were the capital for the expedition; and each participant's capital was returned to him upon the completion of the project. The horses, wagons, machinery, and labor required for barn raisings or threshing were furnished by the participants, and were returned to them after each job or threshing season. Each participant ceased to provide such capital, and capi-

tal previously furnished was returned to him, when he ceased farming and, thus, no longer had need for the barn-raising or threshing services and equipment of his neighbors. In such informal, cooperative enterprises, the temporary nature of the capital employed was plain."
*Id.* at 394.

8. Today, in most jurisdictions, a cooperative can incorporate either with or without capital stock. Packel, *supra,* § 5(c) at p. 35.

tributions to capital by current patrons, and to the extent that new contributions increase the capital above that needed the excess is returned to the patrons who made the earliest contributions. Necessarily there is some awkwardness in the use of shares of stock in a cooperative with revolving capital, but these are tempered by employing different classes of shares. *Id.* at 398–402.

The relationship of the stock cooperative to the member-stockholder who contributes capital is not strictly debtor-creditor, for there is no loan with a maturity date, nor corporation-shareholder in the commercial sense. Though styled corporation-shareholder it is in fact *sui generis*. Nieman, *supra*, at 397 and 402.

### 3.

It is against this background of recognized principles of cooperative reorganization and operation that Congress has established a comprehensive farm credit system, which is but a part of a broader program of encouraging the organization and development of effective cooperatives.[9] The cornerstone was the Federal Farm Loan Act of 1916,[10] establishing the federal land banks with goals of providing low cost farm credit, promoting farmer ownership of the banks, and established and stimulating among farmers cooperative effort.[11] Farmers could not borrow directly but were required to form national farm loan associations, which, operating on cooperative principles, would serve as middlemen in securing loans. These cooperative associations were required to purchase stock in the federal land banks in amounts relating to the size of loans (5 per cent of face.)[12]

The Farm Credit Act of 1933 [13] established a much broader structure of farm credit around the original twelve federal land banks. Among the new institutions were the Central Bank for Cooperatives and twelve regional banks for cooperatives which had the specific function of lending to farmers' cooperatives. The initial capital, comparatively nominal, was furnished by the United States in the form of $110 million, divided between the twelve regional banks and the Central Bank.[14] Each regional bank had but one class of stock. Each borrowing cooperative had to become a member of the regional cooperative bank and a contributor to its capital by purchasing stock (or subscribing to a guaranty fund) in an amount related to the size of his loan. The purchase price of the stock was paid when the loan was closed, either by being deducted from the proceeds or added to the amount of the loan. However, upon repaying his loan a borrower could withdraw his contribution to capital by demanding redemption of his stock. These withdrawals caused the capital funds remaining in the banks to be insufficient to permit them to operate on a sound basis and to meet the needs of the farmer cooperatives for credit.[15] This is the difficulty which, as Professor Nieman points out, gives rise to revolving fund capital. In 1955 Congress changed the capital structure of the 12 regional banks and the Central Bank for Cooperatives to the revolving fund system.

The Farm Credit Act of 1953 required a study of methods by which to effect increased borrower participation in the management, control, and ultimate ownership of institutions operating under the permanent system of agricultural

9. Packel, *supra*, § 60, p. 275 et seq.

10. 39 Stat. 360.

11. S.Rep. No. 144, 64th Cong.; 1st Sess. pp. 2, 4 and 10.

12. The Senate Report said of this requirement:
"At the outset we secure the personal interest of the borrower by requiring him to contribute to the capital of the loan association 5 per cent of the face

of his loan. This personal stake makes the * * * borrower a cooperator."
S.Rep. No. 144, *supra*, p. 10.

13. 48 Stat. 257.

14. 2 U.S.Code & Admin.News 1955, p. 2949, at 2950.

15. 2 U.S.Code & Admin.News 1955 at p. 2951; *Penn Yan, supra*, 417 F.2d at 1374.

credit available through the Farm Credit Administration. 2 U.S.Code & Admin. News 1955 at pp. 2947, 2949. The Farm Credit Act of 1955, 69 Stat. 655, which overhauled the entire system of farm credit, was the result of that study. The Senate Committee reported that the House Bill (in no relevant aspect different from the Senate Bill or the Act as passed) "would be a forward step in the goal of having private borrowers owning and managing these credit agencies." *Id.* at 2948.

The House Committee Report described the purpose of the legislation in this way:

> The primary purpose of title I of the bill is to provide a plan under which the banks [for cooperatives] would be organized on a truly cooperative basis. Borrowing cooperatives would continually make capital contributions to the system so long as they used its credit service. Each year final net savings (after taxes, dividends, reserves, and surplus requirements) would be distributed as patronage refunds to borrowing cooperatives in the form of capital stock, all of which capital would remain in the system until all of the capital stock of the United States had been retired. Each year Government capital would be retired in an amount equal to the required stock contributions of and the patronage refunds to the borrowing cooperatives.

*Id.* at 2951.

The Act established a pure revolving fund capital structure. *Penn Yan, supra,* 417 F.2d at 1374. It created Classes A, B and C stock, A owned by the government (nonvoting and no dividends), B owned by investors (nonvoting but dividend paying), and C (voting but only one vote to a member, no dividends). 12 U.S.C. § 1134d. Each year, as capital is added through investment in Class C shares by each borrower, and through distribution to borrowers of patronage refunds in the form of Class C shares, an equal amount of Class A shares is retired. Retirement of Class C shares will commence when all Class A stock has been retired, except that as Class C is retired all earlier issued Class B must also be called for retirement.[16] There is no retirement of stock on demand.

In lieu of the one-time purchase of stock previously required of each borrower, the 1955 Act substitutes a system of scheduled purchases of Class C stock. "[E]ach borrower * * * shall be required to invest quarterly in class C stock an amount equal to not less than 10 nor more than 25 per centum * * * of the amount of interest payable by it to the bank during the calendar quarter. Payment for such stock shall be made quarterly or when the regular interest payments of the borrower are payable." 12 U.S.C. § 1134d(a) (3). Prior to the 1955 Act required purchases were unrelated to interest but keyed to the amount of the loan. Post-1955 purchases are keyed to interest only as a measure of the amount of stock to be purchased. It is obvious that they are keyed to payments of interest for convenience of billing and payment—the borrower pays his scheduled contribution to capital when he makes his interest payment, whether quarterly or otherwise. Amounts due for interest and investment in stock are rendered in the same bill, although separately stated and identified. A borrower who owns Class B stock and does not want to make the required investment in Class C stock by paying cash can convert his Class B to Class C. 12 U.S.C. § 1134d(a) (3). This has been done by the New Orleans Bank in many instances, always on a dollar-for-dollar basis, $100 par value of Class C for $100 par value of Class B.[16a]

---

16. The Class B shares are of nominal importance. In 1963 they constituted only approximately 5 per cent of total stock outstanding in the New Orleans Bank.

16a. The necessity of not being hypnotized by the phraseology of the commercial corporation is pointed up by 12 U.S.C. § 1134d(b). If a borrower is not author-

Pre-1955 stock can be converted to Class B or Class C. This has been done on the same basis of dollar for dollar of par value. Some holders of pre-1955 stock have been allowed to apply the full par value thereof against their loans outstanding.

The bank has a statutory lien on the borrower's Class C stock. In cases where it has been exercised against a defaulting borrower, the full par value of the stock has been applied to the loan balance.

In 1956, promptly after the 1955 Act went into effect, the New Orleans Bank established 15 per cent of interest payable during the quarter as the amount of quarterly investment in stock required of the borrower. It did so pursuant to a policy determination that it hoped to retire all Class A stock by 1976, a 20-year period, and projected the 15 per cent figure as sufficient to achieve that. Retirement has been carried out each year as planned except that the rate of retirement has been better than expected. By 1963 Class A stock had been reduced from the 1956 level of $7,000,-000 to $4,880,000, as against the projected level for that year of $5,150,000. In 1966 the Bank estimated informally that all Class A stock would be retired by 1972 or 1973.[17]

### 4.

Purchase of a single Class C share is a prerequisite to eligibility to borrow from the bank. 12 U.S.C. § 1134d(a)(3). The District Court, the majority in this case and the court in *Penn Yan*

viewed the purchase of this single share as conferring upon the purchaser the full spectrum of benefits that could flow to it from stock ownership, so that no additional benefit could accrue by its securing a loan and, as an incident thereof, purchasing additional stock as required. This misses the whole point of the cooperative structure of the banks. The thrust of the Congressional scheme is the promotion of permanent institutions to supply low cost credit to farmers' cooperatives and to foster the creation of additional cooperatives.[18] Ownership of the bank ultimately will be in the cooperatives. They will also participate in management, to the extent of the private sector of the joint government-private management scheme. A purchase of Class C stock does not increase the capital of the bank or its current lending capacity, since Class A stock in a like amount is retired. But each purchase moves the bank toward its ultimate institutional status as a farmer-owned cooperative supplying low cost farm credit to these taxpayers and others like them. The government "primed the pump" by "revolving in" the initial capital of a joint government-private undertaking, the societal values of which it is not the judicial function to question, and from which the government's capital was designed ultimately to be wholly "revolved out." To view the process of replacing government capital by private capital, as do taxpayers, as producing no benefit to anyone except the government which gets its money back, is to misunderstand both the purpose of Congress and the insti-

---

ized under the law of the state of its organization to take stock in the bank, it must deposit in the "guaranty fund" of the bank the amount it would have invested in stock. This is the contribution to capital by the cooperative patron in its pure sense, unencumbered by share of stock conceptualism. Patronage refunds to such a borrower are credited against its contributions to the fund. Its deposit is returned to it in the same manner as Class C stock is redeemed.

17. The supplemental brief of the United States quotes from an exhibit in the

*M.F.A.* record which states that five of the regional banks have retired all Class A stock and that it is anticipated that all others will accomplish full retirement of the government's investment by 1971.

18. The 1963 report of the New Orleans Bank states that more than half of the cooperatives regularly financed by it are the outgrowth of conferences held by its staff with groups of farmers contemplating the establishment of new cooperatives.

tutional value of the cooperative bank to the cooperatives which will own it and borrow from it.[19]

There are institutional values other than that of continued availability of low cost credit. There is the inherent co-operative concept that it is beneficial to channel into a single integrated effort the assets and needs of the group of patrons. There is the benefit of simple economic power, through ultimate substantial ownership of the established, fully capitalized, staffed, and accepted financial institution.[19a]

Other benefits are perhaps more easily perceived because in the more conventional garb of dollars. As borrowers, taxpayers qualify for patronage refunds, distributed to them annually in proportion—as in all cooperatives—to their use of the services offered, thus in this instance measured by interest paid. In 1958–63 Coastal received patronage refunds in Class C stock of $289,309.81. In 1961–63 Mississippi received $81,272.-57. Together these are 14 per cent of *all* Class C stock (purchases and refunds) outstanding at the end of fiscal 1963. When their purchases of Class C stock for those years are added, it is revealed that together the taxpayers owned 24 per cent of the outstanding Class C stock.

Also each bank allocates on its books each year to each patron, in proportion to interest paid by the patron, a portion of the amount by which the bank's contingency reserves exceed its needs.[20] For the same years as above, Coastal was allocated from surplus $127,748.62, Mississippi $35,771.48. This "allocated surplus" eventually is distributed in the form of Class C shares.[21] The patronage refunds and the allocated surplus are not a return of the borrower's contributed capital but distributions of earnings, not presently convertible to cash but in due course "revolved out" of the cooperative capital into cash to the borrower.

These benefits are measured by the borrower's use of services. But he does not qualify for them by the act alone of borrowing, only by borrowing plus contributing to capital. Congress could have chosen other approaches. A large contribution to capital to become eligible for service was a possibility, but this would be inconsistent with the cooperative concept of nominal financial outlay to become a patron (a small membership fee for the nonstock cooperative, a small purchase of stock for the stock cooperative), with the real and substantial contribution to capital made in proportion to use of services. It would be inconsistent with the aim of fostering organization and growth of fledgling cooperatives. Congress could have required a large one-shot contribution when the loan is made, but it had discovered the disadvantages of this before 1955. It

19. The benefit to these taxpayers, of the New Orleans Bank as a source of low cost credit, is quickly seen by a look at the years here in question. Their purchases of Class C stock for these years were, in round figures: Coastal (1958–63)—$11,700; $33,900; $47,100; $41,700; $35,000; and $42,100. Mississippi (1961–63)—$18,900; $16,800; and $19,-300. Each purchase represents 15 per cent of the interest paid for the year. Interest usually was between 4 and 5 per cent. A simple calculation reveals the massive extent of the loans which they were enjoying.

From its organization through fiscal 1963 the New Orleans Bank made loans to its limited class of borrowers in its region (Louisiana, Mississippi and Alabama) of more than $618 million.

19a. Also it should be noted that the major source of loan funds for each bank is not its capital but funds which it obtains by borrowing from the Central Bank and the federal intermediate credit banks and by sale of debentures in cooperation with other regional banks. This access to low cost funds, and government-assisted credit, continues after Class A stock is retired.

20. Included therein are like distributions which the regional bank receives from the Central Bank for cooperatives.

21. The separate increments of value represented by the Class C stock (purchased and patronage refunds) and the allocated surplus are pointed out in Columbia Bank for Cooperatives v. Lee, 368 F.2d 934 (4th Cir. 1966).

could have provided for adding to capital by higher interest rates carried forward into earned surplus, but this would be inconsistent with its purposes of offering low rates and at the same time shifting from government to private ownership through the normal revolutions of revolving fund capital.

### 5.

The *sui generis* stock of an incorporated cooperative need not have the same characteristics as ordinary commercial stock to be a capital asset. But the differences loom so large in the minds of the plaintiffs, of the District Court[22] and the majority in this court that brief comment is appropriate.

No Class C stock certificates are issued. A form for the certificates has been approved by the Farm Credit Administration, but the Board of Directors of the New Orleans Bank exercised the discretion given them by the bylaws not to issue certificates. The Bank reflects on its stock ledger the amount of each type of Class C stock owned and at the end of each fiscal year notifies each owner of the amount owned at the beginning and end of the year.[23]

The stock has no dividend and no growth potential. This is normal for a cooperative.

Only the first share of Class C stock carries a voting right. "One person one vote" is a basic cooperative principle, which gives recognition to the concept of an economic democracy. Packel, *supra,* at 138–340.[24]

Class C shareholders will not enjoy sole control of the bank in the commercial sense even when all Class A stock is retired since they will not elect all directors of the joint board which administers it and other farm credit agencies of the region. This makes the stock different from some commercial stock[25] but no less a capital asset.

The stock is not transferable except to other cooperatives and with the consent of the Bank.[26] This is usual in a cooperative. Packel, *supra,* pp. 3, 127. It is essential to keep out of the membership persons with interests antagonistic to the cooperative and is an effective means to keep patrons from transferring their interests at a profit. *Id.* at 127–128 and cases there cited.

### 6.

The majority center on, and repeatedly employ, the phrase "interest override," and even characterize the requirements of the statute in those terms. The term nowhere appears in the statute, the Congressional history, the loan agreements,

---

22. The District Court, after emphasizing the differences, concluded that the stock "does not enjoy the usual attributes of shares of stock but are mere bookkeeping entries or devices." The District Court made no references to the peculiarities of cooperative financing. In fact its opinion does not even reveal that the New Orleans Bank is a cooperative.

23. This system of recording stock ownership without issuing certificates is no surprise to any holder of shares of almost any one of the major mutual funds which employ the same method for shareholders authorizing automatic reinvestment of dividends and which, like the New Orleans Bank, notify the shareholder periodically of how many new shares he has acquired.

   A certificate of stock is not the stock itself but only evidence of ownership. The rights and duties between corporation and stockholder exist apart from the certificate. 11 Fletcher, Corporations, § 5092 (Perm. ed.).

24. The principle is carried forward into the Capper-Volstead Act under which a cooperative marketing association, if it wishes to enjoy immunity from the Sherman Act, must not allow a member more than one vote regardless of how much stock he owns. 7 U.S.C. §§ 291–292.

25. Commercial preferred stock often is nonvoting, and nonvoting common of many companies is traded daily on the stock exchanges.

26. There have been a few approved transfers incident to liquidation, merger or accommodation between cooperatives.

   But compare Columbia Bank for Cooperatives v. Lee, 368 F.2d 934 (4th Cir. 1966), stating that once issued Class C stock is transferable to any person.

or the quarterly bills sent taxpayers showing separately interest, principal and "C stock subscription." The President of the New Orleans Bank explained that the term had grown up in that regional bank and in turn had been picked up by its borrowers.

Class C stock purchased under the required investment provisions is shown in the stock ledger separate from that issued as patronage dividends, and under the heading "Investment in C Stock (Interest Override)." The President defined "interest override" as "the amount we require our borrowers to pay over and above interest for the purchase of C stock."

The promissory notes signed by taxpayers provide for interest. Each separate loan agreement provides:

Stock Purchase: The association shall invest quarterly in class C stock of the bank at its fair book value, not exceeding par, an amount equal to 15 per cent of the amount of interest payable by the association to the bank on said loans for said calendar quarter or part thereof. The association shall pay for said class C stock on the date interest is due and payable. * * *

### 7.

The plainly erroneous rule applied to the finding of the District Court that the Class C stock has only nominal value, may not be the basis of an affirmance. What has been said makes clear that the stock has, as the Eighth Circuit concluded in *MFA*, an intrinsic value. Also it is apparent that the District Court's finding was based on the erroneous basis of comparing the stock, characteristic by characteristic, with that of the usual commercial corporation and totally overlooking its value as a capital contribution to a cooperative under the plan of the Congress.

On the issue of value, in Columbia Bank for Cooperatives v. Lee, 368 F.2d 934 (4th Cir. 1966), a bankrupt cooperative owned Class C stock of the Columbia regional bank with a par value (in round figures) of $54,200, Class B stock with a par value of $45,800, and there had been allocated to the bankrupt surplus of $13,000, total $113,000. The referee ordered the bank to allow a setoff of this $113,000 against the cooperative's indebtedness to it of $162,000, and the District Court affirmed.[27] Another cooperative had offered to buy the stock for $50,000, which was 45 per cent of its par value and allocated surplus. The Fourth Circuit held that the bank was not required to offset at par value and remanded for valuation by the referee. It declined to accept the single offer of $50,000 as a reasonable reflection of true value and noted, "However thin the general market for these shares may be, the continuing stream of borrowers from the bank provides it with a ready market." 368 F.2d at 940.[28] The Columbia Bank projected retirement of all Class A stock by 1967. New Orleans Bank stock may be worth less than 45 cents on the dollar because of the difference between projected 1967 retirement of Class A and projected 1972–1973 retirement. But the discount is not to $1.00 per share or less. In the present case an expert familiar with cooperative financing presented a full and careful analysis of Class C stock of each year separately and assigned values ascending from $3.42 per share for 1958 Class C stock to $38.65 per share for that of 1963.

### 8.

My brothers have, in Professor Neiman's terms, felt the leg of the elephant

---

27. The New Orleans Bank in many instances has made just such a full offset without legal proceedings.

28. On remand (not officially reported) no valuation by the referee was necessary. The parties agreed that the trustee would receive a credit in the amount of the value of bankrupt's stock plus allocated surplus, a total of $112,694.97, and the trustee agreed to pay the bank cash of $49,305.03, which was the balance of the bank's claim.

and concluded that the beast is interest. A look at the concept of cooperatives, the legislative history, the expressed intent of Congress, the language of the statute, the books and records of the parties and the loan agreements signed by the taxpayers, reveals that it is an elephant after all. I would join with the Eighth Circuit and would reverse.